NEIL R. ANAPOL, SBN #141764
LAW OFFICES OF NEIL R. ANAPOL
2550 Hollywood Way, Suite 202
Burbank, California 91505
Telephone: (818) 566-7355
Facsimile: (818) 566-7875

Attorneys for Plaintiffs Agnes Itzhaki, Rontal Development, LP, and Rontal Development, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA,**

**WESTERN DIVISION**

| | |
|---|---|
| AGNES ITZHAKI, an individual; RONTAL DEVELOPMENT, LP, a California partnership; RONTAL DEVELOPMENT, LLC, a California limited liability company;<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES LIABILITY INSURANCE COMPANY, a Pennsylvania corporation, and DOES 1 through 100, inclusive;<br><br>Defendants. | Case No. 2:20-cv-11271 AB (Ex)<br><br>[*The Hon. Andre Birotte Jr.]*<br><br>DECLARATION OF CHARLES MILLER IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; EXHIBITS "A" AND "B"<br><br>Date: April 9, 2021<br>Time: 10:00 A.M.<br>Crtrm.: 7B |

1. I, Charles Miller, declare as follows: I have personal knowledge of the matters set forth herein, and if called as a witness, could and would testify competently thereto.

## I. INTRODUCTION

2. I have been retained by Agnes Itzhaki, Rontal Development, LP, and Rontal Development, LLC (hereinafter collectively referred to as “Itzhaki”) to provide my expert opinion on United States Liability Insurance Company's (USLIC") denial of coverage in the matter of *Takas v. City of California City, et al*., Kern County Superior Court, Case No. BCV-19-101351 (the "Takas Action") and whether that denial accorded with accepted and recognized insurance industry claims handling standards, including the customary meaning, interpretation, usage, application, and practice in relation to: (1) the pollution exclusion provision in the Commercial Liability Policy, policy number CL 178660A, issued to Agnes Itzhaki for the period of December 8, 2017, to December 8, 2018 (hereinafter, the "Policy")[1]; (2) the Policy's Premises Limitation Endorsement; and (3) the Policy's Independent Contractors/Subcontractors Exclusion. The opinions herein are offered to a reasonable degree of professional certainty.

3. A copy of my CV is attached hereto as Exhibit A.

## II. SUMMARY OF OPINIONS

4. Based on my review of the available documents and applying recognized insurance industry claims-handling and insurance policy interpretation standards, it is my opinion that USLI improperly denied its duty to defend and indemnify Itzhaki in the Takas Action. USLI's denial was based on the Absolute Exclusion for Pollution, Organic Pathogen, Silica, Asbestos, and Lead With a Hostile Fire Exception ("Absolute Pollution

[1] The pollution exclusion in the Policy was amended by the "Absolute Exclusion for Pollution, Organic Pathogen, Silica, Asbestos, and Lead With a Hostile Fire Exception" endorsement.

Exclusion"), the Independent Contractors/Subcontractors Exclusion, and the Premises Limitation Endorsement in the Policy. (See August 5, 2019, letter from Cheryl Hazard, USLI Claims Hazard, to Rontal Development, LP.) It was contrary to insurance industry standards to apply the Absolute Pollution Exclusion to Itzhaki's claim because that exclusion applies only to industrial environmental pollution, which did not take place here. Likewise, it was improper for USLI to apply the Independent Contractors/Subcontractors Exclusion, because at the least, that exclusion is ambiguous, and further, by application of well-recognized insurance industry standards for the interpretation of insurance policies, the exclusion does not apply to the facts of this case. Finally, the Premises Limitation Endorsement does not apply by its own terms because it does not exclude coverage for death or bodily injury, which occurs off of Ithaki's premises, where the cause of the death or injury occurs on the property, such as in this matter. In addition, USLI failed to timely advise its insured of this Policy defense, in accordance with insurance industry standards.

## III. BASIS FOR OPINIONS

### A. Background and Experience

5. I have been retained as an expert on insurance industry practices and standards, including standards for the interpretation and application of insurance policy provisions, in more than 100 cases, in both federal and state courts, including those in Nevada, Arizona, California, Idaho, New Mexico, South Carolina, Colorado, Wyoming, Pennsylvania, Florida, the U.S. Virgin Islands, Hawaii, Washington, Oregon, Utah, Arkansas, Texas, Missouri, Massachusetts, Mississippi, Louisiana, West Virginia, and

Toronto, Ontario, Canada. I have been qualified as an expert on insurance industry claims handling standards and practices in Nevada, Arizona, Arkansas, Colorado, Ohio, Washington, West Virginia, New Mexico, Hawaii, Florida, Louisiana, South Carolina, Idaho, and California.

6. My opinions are based on my experience and training as an insurance claims adjuster and manager at Fireman's Fund Insurance Company from 1972 to 1990, my experience and training as a lawyer practicing insurance law, and my experience in reviewing and analyzing the claims handling of other insurance companies. My opinions are also based upon, among other sources, my review and knowledge of insurance industry texts and articles concerning the handling of insurance claims, and of the statutory and regulatory standards for the handling of insurance claims.

7. During my employment at Fireman's Fund, I was responsible for the handling of thousands of claims, either as an adjuster or supervisor, including claims such as the one involved in this case. In many other similar claims, it was necessary, upon notice of an accident or occurrence, for me to thoroughly investigate the claim, determine the scope and extent of damages, and then determine what coverages applied to the loss. During my employment in the insurance industry, I not only had the opportunity to learn about proper claims handling standards from my own employer, but I was also able to observe the claims handling procedures and standards of many other insurers. In addition, I attended numerous classes, workshops, seminars, and similar programs regarding the handling of insurance claims. I have received the Associate in Claims certification from the Insurance Institute of America.

8. My experience with insurance industry claims handling standards continued with my legal practice, which began in 1990. My legal practice, particularly since 1992, has been substantially devoted to insurance matters. As a result, I have been able to review claims files and manuals of many insurers, as well as to observe their claims handling procedures and methods. I have also testified as an expert in insurance claims handling and related matters since 1997. As a result, I again have had the opportunity to review numerous claims files, claims manuals, and other documents regarding the claims handling procedures of many insurance companies.

9. My continuing work in insurance industry-related programs includes presentations on ethics and claims handling at the Property Loss Research Bureau's regional conventions. In addition, I am currently the author of the personal lines claims handling section for the International Risk Management Institute.

**B. Documents Reviewed**

10. I have been provided and reviewed the documents listed on Exhibit B, attached hereto. These documents are the type of documents that are reasonably and customarily relied upon by experts in formulating opinions regarding insurance claim handling standards and practices and an insurer's handling of a claim.

**C. Insurance Industry Standards and Practices**

11. Insurance company claims representatives are routinely trained in the standards of insurance claims handling. Claims personnel are expected to know these standards and apply them in their work on a daily basis. This requirement is underscored in a text on insurance claims, which has been used nationwide to train insurance claims

personnel. In the book, The Claims Environment by Markham et al., the authors, all of whom are or were employed in the insurance industry, point out that "claims representatives should have expert knowledge of insurance policy coverages, the law, and determination of damages" (Markham, p. 12).

12. A claims professional in California, or one who handles claims in California, should be trained and knowledgeable in the standards of insurance claims handling and the insurance policy coverages under which the claim handler is evaluating coverage.

13. Insurance claims professionals are also routinely trained in the interpretation and application of insurance policies sold by their respective companies. These same insurance claims professionals are called upon daily to interpret and apply those policies in the course of handling insurance claims. In interpreting and applying insurance policy provisions, insurance claims professionals will apply the accepted insurance industry standards and practices for insurance policy interpretation. Pursuant to these standards and practices, an insurance company must interpret its policies reasonably, pursuant to the well-recognized insurance industry rules for insurance policy construction, which include the following:

- exclusions are to be interpreted narrowly;[2]
- insuring agreements are to be interpreted broadly;[3]

---

[2] Wollner, Kenneth S., How to Draft and Interpret Insurance Policies (Cas. Risk Pub., LLC, 1999; hereinafter, "Wollner"), p. 19, "Exclusions and other limitations are strictly construed against the party seeking to impose the limitation." All the insurance texts referenced in this report are either used in training insurance claims professionals or as reference materials for claims professionals.

- the insurance company must resolve doubts concerning coverage in favor of the policyholder;[4]
- policy language should be given its plain, ordinary, and popular meaning;[5]
- ambiguous policy provisions should be interpreted against the insurer and in favor of coverage;[6] and
- the insurance company has the burden of proving the application of an excluded peril. The Fire Casualty & Surety (FC&S) Bulletin notes two important principles: "[T]he burden is on the insurer to establish the fact that the exclusions apply. The insurer simply stating that coverage is excluded is not enough to settle the issue; the insurer must prove its case," and "if there is any reasonable doubt as to the applicability of an exclusion, the insured is entitled to the benefit of the doubt. Exclusions are to be construed strictly against the insurer" ("That Particular Part," FC&S, June 2004).[7]

---

[3] Wiening, Eric A., & Malecki, Donald S., Insurance Contract Analysis (Am. Inst. of CPCU, 1st ed., 1992), p. 76, "[I]nsurance agreement provides a broad statement of coverage."

[4] Popow, Donna J., Property Loss Adjusting (Am. Inst. of CPCU, 3rd ed., 2004), §5.34 (hereinafter, "Popow").

[5] Thomas, Paul & Reed, Prentiss, Adjustment of Property Losses (McGraw Hill, 4th ed., 1977), p. 48.

[6] Id., p. 50.

[7] The FC&S Bulletins have been published by the National Underwriter for more than 50 years to assist insurance companies in the interpretation and application of a wide variety of insurance policy provisions. The FC&S Bulletins are used frequently by insurance industry claims professionals to interpret and apply insurance policy provisions. As one Court has noted: "The FC & S bulletin, which is published by the National Underwriters Association, is used by insurance agents and brokers to interpret standard insurance policy provisions [citation omitted]. . . . [R]eliance on [an] FC & S bulletin is appropriate under Civil Code section 1645 which provides: 'Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense [citations omitted].' . . . [I]nsurance industry publications are particularly persuasive as interpretive aids where they support coverage on behalf of the insured. Ultimately, the test is whether coverage is 'consistent with the insured's objectively reasonable expectations' [citation omitted]" (*Golden Eagle Insurance Co. v. Ins. Co. of the West*, 99 Cal.App.4th 837, 838 [Cal. App. 2002]).

14. In arriving at my opinions in this case, I have applied the standards for insurance claims handling.

## IV. OPINIONS

### A. The Customary Meaning, Interpretation, Usage, Application, and Intent in the Insurance Industry for the Pollution Exclusion Contained in USLI's Policy.

#### 1. The Pollution Exclusions Are Limited to Traditional Industrial Environmental Pollution, Not to The Types of Activities Engaged in by Itzhaki.

##### a. Introduction.

15. It is first important to consider the insurance industry's representations and underwriting intent regarding the scope of the pollution exclusions.

16. My opinions are based, in part, on the insurance industry's representations regarding the scope of the pollution exclusions discussed herein. In several statements, the insurance industry took the position that the exclusions apply only to traditional environmental pollution. Some of these statements were made to state insurance regulators. Since it is through these regulators that policyholders have their only opportunity to participate in discussing the terms of standardized insurance policies, the insurance industry representations to the regulators are tantamount to the positions a party may take in negotiating a contract with another party. Accordingly, statements made by representatives of the insurance industry regarding the underwriting intent behind the pollution exclusions are of critical importance in determining how to now interpret and apply those exclusions.

17. Insurance policies are commonly standardized form policies, which are used throughout the insurance industry. The policy forms are submitted to the various state insurance regulators for approval before they can be used in a given state. Policyholders are not involved in the drafting of the standardized policy forms, such as the pollution exclusions. The only other party that may possibly be involved in commenting upon, or even proposing changes to, proposed insurance policy forms are the state regulators. In that capacity, the state regulators are the representatives of the policyholders. It should also be pointed out that in many states there is no regulatory process of examination and approval of standardized policy forms; rather, in those states the insurer merely has to file the proposed policy form in accordance with the state laws, after which the insurer may commence using the form. In these states, there is seldom, if ever, a representation made by an insurer regarding the intent behind the submitted policy form. Therefore, we must look to those states in which the regulatory process provides a procedure for examination and comment upon the proposed policy forms to understand how the insurance industry viewed the proposed changes to the pollution exclusions in use over the past 30 years.

18. It is also particularly apropos to consider underwriting intent when determining how to apply a particular insurance policy provision. Underwriting intent is the insurers' own understanding of the meaning of a policy provision. This intent is commonly derived from a lengthy process in the insurance industry whereby insurance industry representatives meet to discuss the need for a particular policy provision, debate the language that should be used in the provision to achieve the goals of the policy

provision, and then determine the rating structure for the policy provision once it is put into use. The record of this process provides valuable insights into what the insurance industry intended by the policy provision. Further, this record is used by insurance claims personnel to assist themselves in determining how to apply a particular policy provision. Because the insurance industry uses this record itself to assist in applying insurance policy provisions, it is appropriate to consider the underwriting record when evaluating the application of the insurance industry's own pollution exclusions.

**b. The Customary Understanding, Purpose, and Scope of Pollution Exclusions in the Commercial General Liability ("CGL") Policies.**

19. Beginning in 1973 and up to 1984, the standard pollution exclusion in the Comprehensive General Liability ("CGL")[8] policy was the sudden and accidental pollution exclusion. This exclusion provided that the insurance does not apply:

> To bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmospheres or any water course or body of water; but this exclusion does not apply if such discharge, dispersal release or escape is sudden and accidental.

20. Several Courts construed the phrase "sudden and accidental" to apply to both sudden and long-term polluting events. According to the testimony of Michael L. Averill, the manager of the Commercial Casualty Division of the Insurance Services Office (hereinafter, "ISO") in New York, in his December 18, 1985, testimony before the

---

[8] The title "Comprehensive General Liability" was later changed to "Commercial General Liability." The abbreviation CGL will be used herein to refer to both the Comprehensive and Commercial General Liability titles for the standard ISO liability policy.

New Jersey Department of Insurance, "ISO is a not-for-profit corporation which provides a variety of rating and advisory and statistical services to the PC [Property Casualty] industry. We are a voluntary organization made up of companies who choose to associate with us to receive any or all of our services. One of the services we do provide is the development of policy forms and endorsements that are made available to our companies" (Transcript of testimony, pp. 8–9).

21. In 1984, the ISO redrafted the sudden and accidental pollution exclusion. The new exclusion was initially referred to as the Absolute Pollution Exclusion. This exclusion is misnamed, because by its own terms it is not absolute (See "CG 21 49—Modified Broad Form Pollution Exclusion Endorsement," International Risk Management Institute [hereinafter, "IRMI"], p. 1, "although commonly referred to as the 'absolute' pollution exclusion, [the exclusion] does not eliminate all coverage for liability arising out of pollution incidents").[9] Accordingly, the absolute pollution exclusion will be referred to hereinafter as the "Broad Form Pollution Exclusion." This terminology has also found acceptance in the insurance industry. (See "The CGL Pollution Exclusion,"

[9] The International Risk Management Institute ("IRMI") publishes several volumes on various types of insurance policies, such as professional liability, commercial liability, commercial property, and personal property policies, including this volume on insurance claims handling. These volumes are also used widely in the insurance industry to assist claims personnel in the interpretation and application of insurance policies. According to the IRMI "Personal Risk Management & Insurance" publication, the publication "was designed, researched, and written by the staff of IRMI, with the assistance of technical advisers. . . . It is designed to be used by those with a working knowledge of insurance—insurance . . . adjusters—to give them detailed and practical information about specific topics on which they questions. . . . The research for the [publication] involved a thorough review of insurance literature, legal research, and interviews with many underwriters, agents, attorneys, and adjusters. Virtually all of the text was written by IRMI staff and has been extensively reviewed by insurance professionals not affiliated with the firm. In addition, each section written by us was carefully reviewed internally and revised as necessary" (1st reprint, September 2004, Preface).

IRMI, p. 1, "The absolute pollution exclusion, in other words, was not 'absolute' at all. For that reason, it is referred to in this manual as the 'broad form' or 1986 pollution exclusion, except in the context of a direct quotation from another source"). The Broad Form Pollution Exclusion, which is contained in the Policy, provided that coverage would not be provided for:

> **f. Pollution**
>
> **(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":
>
> **(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:
>
> **(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;
>
> **(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or
>
> **(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";
>
> **(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;
>
> **(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:
>
> **(i)** Any insured; or
>
> **(ii)** Any person or organization for whom you may be legally responsible; or

> **(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:
>
> **(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;
>
> **(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or
>
> **(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".
>
> **(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".
>
> © Insurance Services Office, Inc., 2012 (emphasis in original)

22. One of the principal reasons for the drafting of the Broad Form Pollution Exclusion was not only to address long-term polluting events, but also to respond to the increasing number of federal and state laws that were being enacted to address traditional environmental pollution. As was noted in one insurance industry text, the Broad Form

Pollution Exclusion was intended to target the enforcement of several then-new environmental laws, particularly

> [e]nforcements under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA) of 1980, also known as Superfund; the Superfund Amendments and Reauthorization Act of 1986, referred to as SARA; and the Resources Conservation and Recovery Act (RCRA) of 1976. Alleged polluters, especially those who are or were involved in the handling of wastes, are commonly looking to their CGL policies for protection in the wake of suits filed against them by federal government enforcers. Because the 1970 [sudden and accidental] pollution exclusion has not lived up to insurers' expectations, the action to implement a broader exclusion and a buy-back procedure was viewed as the only way to keep insurers from having to pick up all the costs prompted by the pollution claims and suits.
>
> (Malecki, Donald S. & Flitner, Arthur, L., CGL Commercial General Liability Commercial Lines Coverage Guide [Nat'l Underwriter Co., 8th ed., 2004], p. 41; hereinafter, "Malecki & Flitner")

23. In 1988, ISO introduced the Total Pollution Exclusion. The exclusion is also misnamed because even by its own terms, it is not a Total Pollution exclusion. (See "How 'Total' Should a Total Pollution Exclusion Be?", IRMI's Environmental Insurance Reports, Vol. 6, No. 1, February 2003, p. 2, "Insurers have already acknowledged that even a 'total' exclusion is not intended to eliminate coverage for *every* instance of injury or damage that can be linked to a 'pollutant'".) Accordingly, it will be referred to herein as the Modified Broad Form Pollution Exclusion. The Modified Broad Form Pollution Exclusion provides, in pertinent part, that coverage is not afforded for the following:

> "Bodily Injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.
>
> . . .

> "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**c. The Broad Form and Modified Broad Form Pollution Exclusions Are Intended to Apply to Traditional Industrial Environmental Claims, and Not to Claims Such as Itzhaki's Claims.**

24. There is substantial evidence that the insurance industry did not intend the Broad Form Pollution Exclusion to apply to non-traditional pollution. The following discussion provides a summary of some of the evidence regarding the insurance industries' intent concerning the scope of the Broad Form Pollution Exclusion.

**i. Hearings Before the Texas Department of Insurance.**

25. On the two days of October 30–31, 1985, the Texas Department of Insurance held a hearing regarding proposed changes to the CGL. During the hearing, some witnesses addressed the Broad Form Pollution Exclusion. David H. Thornberry, a member of the Texas State Board of Insurance, questioned Wade Harrell, Liberty Mutual's representative at the hearing, regarding the scope of the Broad Form Pollution Exclusion:

> Mr. Thornberry: Let me ask the next questions, and I may have already anticipated the answer. In both the claims-made and the occurrence [CGL] forms that have been filed on the pollution exemption under just the original commercial general liability exclusion 2-F on pollution, bodily injury or property damage arising out of the actual alleged or threatened discharge, dispersal, release or escape of pollutants, then are listed at different places that may apply to different locations. The definition of pollutants is, "Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids,

> alkalis, chemicals and waste." Waste includes certain other things.
>
> My reading of that language is so broad that the example I have been given in the past—the grocery store where the alkali or acid spills on the floor, either through negligent failure to clean it up or negligence, the child walks in and falls in it, is disfigured. My reading of that exclusion is that's pollution excluded from the policy and there is no coverage. And that I guess is the correct reading.
>
> Mr. Harrell: That is a reading, yeah. It can be read that way. . . . I don't know anybody that's reading the policy that way, and I think you can read the new policy just the way you read it. But our insured would be at the state board—someone said yesterday—quicker than a New York minute if, in fact, every time a bottle of Clorox fell off a shelf at a grocery store and we denied the claim because it's a pollution loss.
>
> Mr. Thornberry: I have also heard the justification that if an insurance company denied the claim and you went to the courthouse, they wouldn't read it that way.
>
> Mr. Harrel: Nobody would read it that way. [footnote omitted]
>
> . . .
>
> Mr. Thornberry: I guess my problem is, why do we have language that appears—if there's an ambiguity, why don't we have it cleared up rather than in the policy.
>
> . . .
>
> Mr. Harrell: . . . **We have overdrafted the exclusion. We'll tell you, we'll tell anybody else, we overdrafted it.**
>
> (Transcript of Proceedings, *Hearing to Consider, Discuss and Act on Commercial General Liability Forms Filed by the Insurance Services Office, Inc.*, Texas Board of Insurance, No. 1472. Vol. III at pp. 7–8, Oct. 31, 1985; emphasis added)

26. Mr. Harrell's testimony acknowledges that the insurance industry drafted the Broad Form Pollution Exclusion so that it would encompass polluting events that the insurance industry intended to cover. This was apparently done because of the insurance industry's concern that it could not draft a pollution exclusion that would meet the

insurance industry's original objective of precluding coverage for only traditional industrial environmental damage (Id.).[10] Indeed, the industry apparently recognized that, because the Broad Form Pollution Exclusion was so broadly drawn, it would likely not be enforced by the Courts. As such, underwriters were instructed to include in CGL policies not only the Broad Form Pollution Exclusion, but also specific exclusions for specific types of pollution in the event that the Broad Form Pollution Exclusion was found to be unenforceable, as apparently the insurance industry expected it to be.

27. Ed Reinheimer, the Travelers Insurance Company representative, also testified at the Texas hearing:

> Mr. Reinheimer: I'd like to add just a company perspective on that. I have been preaching to our underwriters that this is as good as we can do as a generic pollution exclusion, but when you underwrite a risk if you have a specific exposure that concerns you—if there's a premises they have in Rochester that they have since sold and you think there may have been some underground tanks, you'd better put on an exclusion that deals with any discharges from the tanks at the Rochester location for our own protection. Because this language is very broad, I think the underwriter is still well served by trying to identify and deal with specific exposures when they appear. But there's no way to deal with generic policy language. Those individual risk considerations.
>
> We had to have as broad a generic treatment as we could in the policy as a fail-safe, if you will. But as a practical matter we're best served by dealing with individual exposures as they appear.
>
> Mr. Thornberry: You're saying that different risks might get different endorsements?
>
> Mr. Rineheimer: Yeah, tailored to specific exposures that that risk may present. Not to say that this is going to replace

[10] There is no indication that the insurance industry has ever attempted to draft such an exclusion. There is no reason to believe that such an exclusion could not be successfully drafted.

> the exclusions in the policy. But because we're not sure what the courts are going to do and when we go with this exclusion.
>
> (Transcript of Proceedings, *Hearing to Consider, Discuss and Act on Commercial General Liability Forms Filed by the Insurance Services Office, Inc.*, Texas Board of Insurance, No. 1472. Vol. III at pp. 9–10, Oct. 31, 1985)

28. The testimony clearly evidences the insurance industry's understanding both that the Broad Form Pollution Exclusion was drafted too broadly so as to exclude claims that would otherwise be covered under the CGL, and that the exclusion may not be enforced by the Courts, thereby necessitating additional exclusions added by endorsement, which would address specific types of polluting events.[11] If the Broad Form Pollution Exclusion, and now the Modified Broad Form Pollution Exclusion, was enforced as written, then the insurance industry would have its "safety valve" in place, but this would be at the cost of depriving policyholders of otherwise covered claims. Clearly, the Broad Form and Modified Broad Form Pollution Exclusions were written solely to benefit the insurance industry at the cost of coverage to the policyholder.

**ii. Hearings Before the Louisiana Department of Insurance.**

29. The Louisiana Department of Insurance (hereinafter, "LDOI") conducted a study of the Broad Form Pollution Exclusion. On the two days of September 6–7, 1995,

---

[11] These would include additional endorsements excluding coverage for lead, asbestos, and fungus, among other substances. There would be no apparent need for these additional endorsements if, as the insurance industry wants to argue now, the Modified Broad Form Pollution Exclusion applies to all pollutants, as defined, which would include lead, asbestos, and fungus. Clearly, from the insurance industry's perspective, these must be viewed as redundant exclusions. The testimony before the Texas Department of Insurance reveals why the insurer imposed such redundant exclusions: The insurance industry did not believe that the Broad Form Pollution Exclusion, and now the Modified Broad Form Pollution Exclusion, would be enforced.

the LDOI held hearings on the Broad Form Pollution Exclusion. The purpose of the hearings was to "seek full disclosure from the [insurance] industry regarding the scope and intent of the pollution exclusion" (Testimony of James Brown, Commissioner of Insurance, LDOI Hearing, Transcript, p. 6).

30. During the LDOI hearings, C. Noel Wertz, LDOI Senior Attorney, stated that the use of such terms as irritant in the definition of pollutants would mean that,

> [V]irtually anything that causes injury to somebody is excluded under the coverage—coverage is excluded because of the [Broad Form] pollution exclusion. And yet the industry said it wasn't our intent to eviscerate general liability coverage provided by the policy.
>
> [T]he insurance industry said when they submitted it [Broad Form Pollution Exclusion], we know this language is broad, we know it's overdrafted, trust us to use it in the proper manner. We have to say the record shows it hasn't been used properly.
>
> I can quote from a Mr. Burger with Zurich Specialties who said in a recent article in <u>Best</u> that the absolute pollution exclusion was a knee jerk reaction to Superfund legislation.
>
> (Statement of C. Noel Wertz, Commissioner of Insurance LDOI Hearing, Transcript, pp. 14–15)

31. LDOI "concluded that the various versions of the pollution exclusions, including the so-called absolute pollution exclusion, properly apply only to environmental pollution." The LDOI criticized the insurance industry's inclusion of pollution exclusions in a wide variety of policy forms, and its overuse of those exclusions in denying coverage. The LDOI issued an advisory letter regarding the pollution exclusions and "warned that insurance companies should rely on exclusions to disclaim coverage only for claims made by intentional active industrial polluters" (footnote omitted). The Louisiana Commissioner found that the insurance industry had been

ignoring its regulatory promises to apply the exclusion in a principled manner, in cases involving industrial pollution. The LDOI's advisory letter stressed that the Department would take future action if it was needed to protect "the integrity of the regulatory process: [footnote omitted] The appropriate use of the standard pollution exclusion in claims handling is an issue of grave concern. The [Louisiana Department of Insurance] will take such action as is necessary to assure that the integrity of the regulatory process is not undermined" (Id., quoting from State of Louisiana Advisory Letter No. 87-91 at pp. 3–4, June 4, 1997.)

32. The LDOI also provided guidelines to insurers on when the pollution exclusions should be applied to claims:

> [I]n handling claims the LDOI strongly advises insurers to consider the following in deciding whether or not a claim triggers a policy's pollution exclusion.
>
> 1. Does the claim involve an incident which caused an environmentally significant discharge of pollutants resulting in environmental damage?
> 2. Do the policyholder's regular business activities place it in the category of an "intentional active industrial polluter"?
> 3. Does the claim involve an injury alleged to have been caused by a product, including exposure to fumes, which was being used in accordance with its intended purpose?
> 4. Does the claim involve an injury alleged to have been caused by exposure to asbestos or lead?
>
> If the answer is "NO" to (1) or (2) or "YES" to (3) or (4) of the above, the denial of coverage and/or refusal to provide a defense may result in administrative action.

33. Itzhaki's claims are covered based on the foregoing LDOI factors. With regard to the Itzhaki claim, the answers to questions (1) and (2) are obviously "NO."

Accordingly, under the LDOI's standards, the pollution exclusions found in the USLI Policy do not apply to the Itzhaki claim.

**iii. The Insurance Industry Has Acknowledged That the Broad Form Pollution Exclusion Has Been Improperly Applied to Non-Traditional Environmental Pollution.**

34. The insurance industry has also recognized that the Broad Form Pollution Exclusion was too broadly drafted, so that it arguably encompassed claims that would not be classified as traditional industrial environmental pollution. The International Risk Management Institute has noted that the "overly broad nature of the post-1986 pollution exclusion [Broad Form Pollution Exclusion] permits insurer abuse," because it may be applied, and has in fact been applied to non-traditional environmental pollution. ("Post-1986 Pollution Exclusions," IRMI, p. 2).

**iv. Insurance Industry Changes to the Broad Form Pollution Exclusion Evidence the Insurance Industry's Intent to Apply the Exclusion Only to Traditional Industrial Environmental Pollution.**

35. The insurance industry's changes to the Broad Form Pollution Exclusion further demonstrate the insurance industry's intent to apply the Broad Form Pollution Exclusion only to traditional industrial forms of pollution, despite language in the exclusion which may be interpreted to apply to non-traditional forms of pollution. The hostile fire exception was added to the Broad Form Pollution Exclusion, and later to the Modified Broad Form Pollution Exclusion, because insurers, based on a literal reading of the exclusion, were applying the Broad Form Pollution Exclusion to injury or damage

from smoke, when that was not the underwriting intent.[12] Significantly, that underwriting intent did not appear in the Broad Form Pollution Exclusion, but was acknowledged by the insurance industry (*Id*., p. 5). The insurance industry took a similar step in 1997, when it added by mandatory endorsement an exception to the Broad Form Pollution Exclusion for bodily injury claims arising from exposure to carbon monoxide from defective furnaces and heaters (Id., p. 6). This change was necessary because insurers were denying coverage for such claims based on a literal reading of the Broad Form Pollution Exclusion, which was contrary to the underwriting intent. In other words, the unstated underwriting intent was to limit the scope of the Broad Form Pollution Exclusion so that it did not apply to exposures to fumes within homes, or to a non-traditional polluting event. In both cases, the insurance industry acknowledged the importance of its own underwriting intent by drafting express language to limit the scope of the Broad Form Pollution Exclusion to traditional polluting events. In so doing, the insurance industry acknowledged that the Broad Form Pollution Exclusion should not be read literally. This can be said for both the Broad Form Pollution Exclusion as well as the Modified Broad Form Pollution Exclusion. In 1999, the hostile fire and building heating equipment exceptions were added to the Modified Broad Form Pollution Exclusion (See "How 'Total' Should a Total Pollution Exclusion Be?", IRMI's Environmental Insurance Reports, Vol. 6, No. 1, February 2003, p. 2, "Both exceptions are added to the CGL pollution exclusion as the result of a growing consensus in the

[12] Indeed, it would be contrary to the long-standing coverage provided by the New York Standard Fire Insurance Contract.

insurance industry that neither smoke from a hostile fire nor carbon monoxide from a defective furnace was the sort of 'pollutant' for which the CGL policy was intended to eliminate coverage"). These additions underscored again the insurance industry's recognition that the Modified Broad Form Pollution Exclusion was intended to apply only to traditional industrial pollution.

**d. The Insurance Industry Also Intended That the Modified Broad Form Pollution Exclusion Would Apply Only to Traditional Industrial Environmental Pollution.**

36. The Broad Form Pollution Exclusion continues in use to this day in the CGL policy. Insurers, however, may endorse a CGL policy with the Modified Broad Form Pollution Exclusion. Given the insurance industry's position that the Modified Broad Form Pollution Exclusion is more extensive than the Broad Form Pollution Exclusion, and therefore further reduces coverage, it would have been incumbent upon insurers, when endorsing a CGL policy with the Modified Broad Form Pollution Exclusion, to advise the policyholder of the reduction in coverage. Indeed, that is required under many state insurance codes. This requirement is also discussed in the insurance industry text, Foundations of Risk Management and Insurance, wherein the author notes the following:

> [T]he reasonable expectations doctrine is sometimes applied to the renewal of insurance policies that contain a change from the original policy. Unless an oral or written notification and explanation accompanies the renewal policy, the insured can reasonably expect that the renewal policy is the same as the expiring policy.
>
> (Nyce, Charles M., Foundations of Risk Management and Insurance [CPCU/IIA, 2nd ed., 2006], §10.10)

37. On August 29, 1994, Dick Friedman and Mark Lyons, respectively the Chairman of Technical Affairs and the Chairman of Governmental Affairs for the Independent Insurance Agents of Iowa, wrote to the Hon. Dr. Terri Vaughan, CPCU, Iowa Insurance Commissioner, regarding the insurance industry's failure to notify policyholders of the change from the Broad Form Pollution Exclusion to the Modified Broad Form Pollution Exclusion, including the original intent behind the Modified Broad Form Pollution Exclusion:

> The first issue is the improper use of the Commercial General Liability endorsement known as "Total Pollution Exclusion" (CG 21 49). Last Winter IIAI [Independent Insurance Agents Of Iowa] discovered that many carriers doing business in Iowa were all of a sudden putting this endorsement on all their commercial policies. [sic] and on renewal policies without notice to the consumer. Iowa Law section 515.81B requires commercial lines carriers to give notice 45 days prior to the expiration date of the policy if "a material reduction in the limits or coverage of the policy or contract" have been made. Of more concern is the across the board or mandatory use of this endorsement by carriers. . . . In testimony given by Arkansas Insurance Commissioner Eubanks at the NAIC hearing on November 3. [sic] 1988 he called to the attention of the NAIC that. [sic] "although ISO contends these proposals are technical in nature, and intended to clarify coverage, one must be sure that these complex proposals do not unduly reduce coverage at the expense of policyholders."
>
> As you can see the across the board approach that carriers are using the CG 21 49 are contrary to the original intent of ISO. [sic] NAIC [sic] and the Iowa Insurance Division. CG 21 49 is <u>only</u> to be used on individually underwritten basis to "afford the flexibility of offering CGL coverage to a <u>high</u> pollution risk policyholder it would not otherwise insure"
>
> (Risk and Insurance Management Society. Inc., August 23, 1988; emphasis in original)

38. In an October 17, 1991, letter from John J. Groody, CIGNA Secretary for the Filing and Regulation Department, to the New Jersey Commissioner of Insurance,

Groody further confirmed that the Modified Broad Form Pollution Exclusion had limited application when he wrote:

> [W]e believe the ISO Total Pollution Exclusion could be interpreted to exclude a bodily injury claim caused by a student spilling a beaker of acid on another student's arm in a chemistry lab because the claim arose out of a "pollutant." Clearly, it is not our intent to exclude this type of claim.

39. When the insurance industry adopted the Modified Broad Form Pollution Exclusion as the replacement for the Broad Form Pollution Exclusion, the industry did not address whether the Modified Broad Form Pollution Exclusion applied only to industrial-type pollution. Given that the insurance industry, along with regulators, interpreted the Broad Form Pollution Exclusion to apply only to traditional or industrial-type pollution, and absent clarification that the exclusion applies to both traditional and non-traditional pollution, that same interpretation should also apply to the Modified Broad Form Pollution Exclusion (See "Chinese Drywall Issues and Information," FC&S, "The [pollution] exclusion was intended to limit or exclude coverage for environmental contamination").[13] Indeed, insurers often change exclusions by adding provisions to expand their scope in consideration of developments in the law regarding a particular exclusion. Because it is understood in the insurance industry that exclusions are to be written clearly (see *Supra*), any changes in an exclusion that are intended to include new developments in the law or expand the scope of the exclusion should be clearly set forth (see "Essentials of Insurance Law – Chapter 7: Rules of Policy Construction," IRMI, p.

---

[13] In this regard, it is significant to note that LDOI, in its June 4, 1997, Advisory Letter addressed both the Broad Form and Modified Broad Form Pollution Exclusions (See fn. 1).

6.) This is demonstrated by the history of the Broad Form Pollution Exclusion itself. From 1986 to 1998, numerous changes were made to the Broad Form Pollution Exclusion either to expand or further attempt to narrow the coverage provided for polluting events. (See Malecki & Flitner, pp. 42–51; and see "The CGL Pollution Exclusion," IRMI.) For example, in 1988, a specific exception to the Broad Form Pollution Exclusion was added for hostile fires (*Id*., pp. 46–47; and see *Supra*). At no time has the insurance industry added clear and conspicuous language to the Modified Broad Form Pollution Exclusion evidencing its intent not to follow its original interpretation of the Broad Form Pollution Exclusion when applying the Modified Broad Form Pollution Exclusion.

40. The terms used in the Broad Form Pollution Exclusion and Modified Broad Form Pollution Exclusion are identical in several material respects. This lends strong support for the conclusion that the Modified Broad Form Pollution Exclusion is intended to apply only to traditional industrial environmental damage. The insurance industry, in concert with the purpose of the Broad Form Pollution Exclusion, represented that the Broad Form Pollution Exclusion applied only to traditional industrial environmental contamination. The insurance industry, in drafting the Modified Broad Form Pollution Exclusion, used the same language as in the Broad Form Pollution Exclusion for the "movement clause" and the definition of pollutants (see *Infra* for definition of the movement clause). If these two critical components of the exclusion were originally intended to apply only to traditional industrial environmental pollution, then their continued use in the Modified Broad Form Pollution Exclusion, without any express language to the contrary, must be interpreted as signaling that the Modified Broad Form

Pollution Exclusion is also limited to traditional industrial environmental contamination. For example, the insurance industry represented with regard to the Broad Form Pollution Exclusion that it was over-drafted and would be interpreted narrowly. Therefore, the term “irritants,” which is used in the definition of pollutants in the Broad Form Pollution Exclusion, would not be given the expansive definition that it might otherwise be given if it were interpreted literally. The insurance industry then used the same definition of pollution, including the word irritants, in its Modified Broad Form Pollution Exclusion. Because the insurance industry chose not to further explain or limit its use of the term “irritants” in the Modified Broad Form Pollution exclusion, that term, along with many others, must be given the same meaning that the insurance industry intended in the original Broad Form Pollution Exclusion. In other words, that term must be interpreted narrowly, so as not to apply to non-traditional polluting events.

41. In determining the scope of the Modified Broad Form Pollution Exclusion, it is important to note the likely source of the language used in the exclusion, and the meaning generally given to that language. In the case of the Modified Broad Form Pollution Exclusion, the terms escape, discharge, release, and dispersal are derived from environmental statutes (see Posner, Katherine B. & Bennett, Robert S., “Products Liability Coverage After Park-Ohio: The Pollution Exclusion Rides Again,” *Environmental Law Journal* 4, Summer 1993, “‘[D]ischarge, dispersal, release or escape’ are environmental terms of art with distinct meanings under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)”.) Where insurers adopt language from a statute, the meaning of the statutory language should be

applied to the similar terms in the insurance policy (see Wollner, p. 66, "Unless the insurance policy specifies otherwise, statutory definitions may be adopted"). Accordingly, in interpreting the meaning of the Modified Broad Form Pollution Exclusion, it is appropriate to consider that the terms in that exclusion are derived from environmental statutes that are commonly understood to be directed at traditional industrial environmental pollution, and not the type of damage that may arise from exposure to Itzhaki's operations on vacant land.

42. An important insurance industry standard for the interpretation of insurance policies is that any interpretation must avoid absurd results ("Essentials of Insurance Law – Chapter 7: Rules of Policy Construction," IRMI, p. 2). An absurd result would be to interpret an insurance policy so that one provision in the policy would negate most or all of the coverage afforded under the policy. This would be the case if the terms like "irritant" or "contaminant," which are used in both the Broad Form and Modified Broad Form Pollution Exclusions, were given their literal meaning. To determine the commonly understood meanings of insurance policy terms, insurers will turn to dictionary meanings for those terms (see *Infra*). Irritant is defined as "something that irritates or excites," or in its verb form, "to provoke impatience, anger, or displeasure in" (<u>Webster's Collegiate Dictionary</u> [11th ed., 2003], p. 663). The adjectival form of irritant is likewise defined as "subjected to irritation; *esp*: roughened, reddened, or inflamed by an irritant" (Id.). Similarly, contaminant means that which acts "to soil, stain, corrupt, or infect by contact or association" (*Id.*, p. 269). It is readily apparent that a literal interpretation of these terms would have profound adverse effects on CGL coverage. For

example, the mere release of water from one neighborhood yard onto another could be defined as an irritant, and thereby excluded. The inadvertent spraying of dish wash soap into the eye of another could be defined as a contaminant, and thereby excluded from coverage. Liability for any injuries arising from either of these incidents is clearly covered under the CGL. A strict interpretation, however, of the Modified Broad Form Pollution Exclusion would obviously vitiate this long-standing coverage. Indeed, such an interpretation would likely swallow up much of the coverage provided by the CGL. This would be an absurd result. Accordingly, it is both reasonable and consistent with insurance industry standards for the interpretation of insurance policies to restrict the scope of the Modified Broad Form Pollution Exclusion so that its application does not defeat the purpose of the CGL policy and insurance in general. A reasonable limitation upon the Modified Broad Form Pollution Exclusion, in concert with insurance industry representations, is to limit the exclusion only to traditional environmental pollution. In this way, the many traditional coverages provided under the CGL are preserved.

43. Many courts have noted that the pollution exclusions discussed herein only apply to traditional industrial environmental damage and not to damage arising from the release of gases or similar substances in a home. Indeed, IRMI has recognized and called to the attention of the insurance claims industry that, "[c]ourts are less likely to enforce a total pollution exclusion endorsement against manufacturers when the circumstances of the claim are significantly different from those of "typical" pollution claims." ("CG 21 49—Total Pollution Exclusion Endorsement," IRMI, p. 2.) Elsewhere, IRMI has noted that, "if the pollution risk profile is not similar to "traditional

environmental pollution," courts say that the insured has a reasonable expectation of coverage under the circumstances, and that applying the post-1986 exclusion would be unreasonable or absurd." ("Post-1986 Pollution Exclusions," IRMI, P. 1.) These courts note that the exclusion is only intended to apply to industrial type pollution. (See e.g., American States Ins. Co. v. Koloms, 177 Ill.2d 473, 687 N.E.2d 72 (1997), Whitmore v. USAA Cas. Ins. Co., Civ. Act. No. 07-5162, 2008 WL 4425227 (E.D. Pa. Sept. 30, 2008) (pollution exclusion did not apply to the discharge of heating oil in the policyholder's basement), and MacKinnon, et al. v. Truck Insurance Exchange, 31 Cal.4th 635 (Cal.2003) (pollution exclusion does not apply to spraying by landlord of pesticide).)[14]

---

[14] A similar conclusion—on similar grounds—was reached by a federal district court in *State Auto Prop. & Cas. Ins. v. Gorsuch*, 323 F. Supp. 2d 746 (W.D. Va. 2004). A CGL-insured property owner built a road across a creek on his property, including culverts beneath the road to allow the creek to flow unimpeded beneath the road. When heavy rains produced a run-off into the creek, the resulting volume of water was too much for the culverts, which caused flooding upstream from the road on property owned by the insured's neighbors. The CGL insurer denied coverage for the neighbors' resulting suit, citing the pollution exclusion and asserting that the flood waters constituted a "pollutant."

The court rejected this argument on several grounds: (1) the back-up of flood waters did not meet the pollution exclusion's requirements of a "discharge" from the insured's premises; (2) uncontaminated surface water does not meet the policy's definition of "pollutant; and (3) the drafting history of the CGL pollution exclusion evidences an intent to apply it only to intentional industrial pollution. With respect to the applicability of the "pollutant" definition, the court had this to say.

> The unambiguous wording of the exclusion does not define water as a pollutant under the present factual circumstances. The provision, in relevant part, deems a pollutant to be "any ... liquid ... irritant or contaminant".... In their plain, ordinary, and popular sense, the terms "irritant" and "contaminant" do not include excess, though not impure or unclean, waters. See *The American Heritage Dictionary of the English Language* (4th ed. 2000) defining "irritant" as "a source of irritation" and citing "tobacco smoke" and "a common eye irritant" as examples; *Merriam Webster's Collegiate Dictionary* 249 (10th ed. 1996) defining "contaminant" as "something that contaminates" and illustrating "contaminate" with the phrases "bacteria contaminated the wound," "iron contaminated with phosphorous," and "water contaminated by industrial wastes".... In addition, the remaining

44. FC&S has also called these decisions to the attention of insurers nationwide. Accordingly, the insurers must carefully consider these decisions, even if they are in other states, when evaluating coverage for the Itzhaki claim. Most importantly the insurers should apply the pollution exclusions, such as those involved in

---

> language comprising the pollution exclusion clause informs the meaning of "contaminant" and "irritant." It refers to "smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste," all of which are traditional industrial pollutants that defile the environment. The terms "discharge, dispersal, seepage, migration, release" and "escape" are also characteristically environmental terms. Also supporting this understanding is the history of the pollution exclusion clause, which indicates that the clause and its predecessors were drafted because "the insurance industry, concerned about public reaction to environmental pollution, desired to clarify and publicize its position that [commercial general liability] policies did not indemnify knowing polluters." *Sullins v. Allstate Ins. Co.*, 667 A.2d 617 (Md.1995).

In 2005, New Jersey joined the list of states that hold the standard CGL pollution exclusion to be applicable only to environmental pollution—not releases or escapes of toxic substances at or within a single premises. *Nav-Its, Inc. v. Selective Ins. Co. of Am.*, 869 A.2d 929 (N.J. 2005). A subcontractor of the insured was hired to apply paint floor sealant as part of remodeling work at a shopping center. A doctor with offices in the shopping center was made ill by inhaling fumes from the subcontractor's work, and brought suit against the insured contractor. The contractor's insurer denied the claim on the basis of its policy's pollution exclusion. The exclusion in question was a type of total pollution exclusion; it contained an exception for short-term pollution events occurring inside a building and not lasting longer than 48 hours, but there was some dispute as to whether the subcontractor's use of the paint and sealant in its work came within the scope of that exception.

The New Jersey Supreme Court based its finding of coverage in part on precedents from other jurisdictions, including the *Belt* and *MacKinnon* decisions discussed above. It concluded that "the scope of the pollution exclusion should be limited to injury or property damage arising from activity commonly thought of as traditional environmental pollution." The court refused to read the 48-hour/inside-a-building exception to the exclusion as implying that a non-environmental release of pollutants could still be excluded if it did not meet the terms of the exception. In the words of the court:

> We find no need to address the ramifications of the 48-hour exception and whether it should be read to expand the pollution exclusion clause. We interpret that exception to limit the reach of the pollution clause, i.e., if the environmental pollution occurs within a building within a single forty-eight hour period, and the other conditions are met, then the insured may receive coverage for that environmental pollution claim. Simply put, if the pollution exclusion is not applicable, neither is the exception to the pollution exclusion.
>
> (IRMI, "Pollution".)

this litigation, in accordance with the insurance industry's own interpretation of the exclusions and regulatory direction. In so doing, the pollution exclusions should not be applied to claims arising out of Itzhaki's operations as they are not traditional industrial operations.

45. During the LDOI hearings regarding the Broad Form Pollution Exclusion, Louisiana Insurance Commissioner James H. Brown testified that, "[o]ur unfair trade practices and claims settlement law prohibits the use of misleading statements or the admission of disclosures regarding the coverage under a policy in both its marketing and its claims handling. This applies to both the front end and the back end." (Transcript of LDOI Hearing, p. 5.) Ms. Wertz further testified with regard to the manner in which the insurance industry was applying the pollution exclusions that, "I think it clearly violates the unfair claims settlement practices [Act]." (Testimony of C. Noel Wertz, Commissioner of Insurance, LDOI Hearing, Transcript, p. 16.)

46. The California Unfair Claims Settlement Practices Act provides that it is an unfair claims settlement practice for an insurer to misrepresent "pertinent facts or insurance policy provisions relating to coverages at issue." (California Ins. Code, §790.03(h)(1).) Based on the information reviewed in preparation of this report, it is my opinion that the insurance industry application of both the Broad Form Pollution Exclusion and the Modified Broad Form Pollution Exclusion to non-traditional forms of pollution, such as here, constitutes a misrepresentation of scope and intent of those exclusions, and is therefore contrary to insurance industry standards, such as the Act.

47. The pollution exclusion at issue in this litigation would not and should not be applied to the claims made against Itzhaki's operations because the insurance industry's customary meaning, interpretation, usage, and intent for that exclusion is that it apply only to traditional environmental pollution resulting from industrial operations and not the type of operations conducted by Itzhaki on her vacant land.

**2. The USLI Absolute Exclusion For Pollution, Organic Pathogen, Silica, Asbestos, And Lead With A Hostile Fire Exception Similarly Applies Only to Traditional Industrial Pollution.**

48. The USLI Absolute Exclusion is an amalgamation of prior pollution exclusions, including the Broad Form and Modified Broad Form pollution exclusions. USLI has also added additional provisions and expanded the definition of pollutants. Nonetheless, it is apparent that the USLI Absolute Exclusion is likewise limited to industrial pollution and not the type of events involved in this case. Indeed, as with the Broad Form and Modified Broad Form Pollution Exclusions, the USLI Absolute Exclusion is anything but absolute.

49. There are several provisions in the USLI Absolute Exclusion that demonstrate its limitation to industrial pollution. First, the Broad Form Pollution Exclusion provides that it applies to "[b]odily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants." Likewise, the USLI Absolute Exclusion for Pollution applies to the "[d]ischarge, dispersal, seepage, release or escape of 'pollutants.'" Further, it is noteworthy that USLI chose to use terms that are commonly used in environmental regulatory statutes, which further underscores that the USLI Absolute Exclusion applies

only to industrial pollution. Accordingly, and pursuant to insurance industry standards, the USLI Absolute Exclusion use of identical language from the Broad Form Exclusion for Pollution applies to only industrial pollution. (See Supra).

50. In this regard, it is significant to note that USLI did not insert any provision in the USLI Absolute Exclusion which clearly included non-industrial pollution. This was the case even though it was widely known at the time that USLI issued the USLI Absolute Exclusion that many insurance industry commentators (and courts) had concluded that the Broad Form Pollution Exclusion as well as the Modified Broad Form Exclusion applied only to industrial pollution. This is significant, because pursuant to insurance industry standards for the drafting, interpretation, and application of insurance policy provisions, where an insurer does not use policy language that limits coverage, where that language is otherwise known and used in the insurance industry, it is understood that the insurer did not intend to so limit the coverage. (See Wollner, Kenneth S., How to Draft and Interpret Insurance Policies [Cas. Risk Pub., LLC, 1999], p. 20, "If a contract provision lists particular items, it is presumed that what it is left out was purposefully omitted.") Accordingly, the absence of any explicit and clear exclusion for non-industrial pollution demonstrates the underwriting intent to apply the USLI Absolute Exclusion to only industrial pollution.

51. Further, the Broad Form Pollution Exclusion provides that it does not apply to:

> **(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

> **(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;.

52. The USLI Absolute Exclusion contains identical language. USLI has therefore adopted language from the Broad Form Pollution Exclusion, without any further limitation, which applies only to industrial pollution, further demonstrating that the USLI Absolute Exclusion likewise applies only to industrial pollution. Further, the language that the USLI Pollution Exclusion does not apply to "the handling, storage, disposal, processing or treatment of waste," is also significant because this language is also drawn from environmental statutes which regulate industrial pollution. For example, the Federal Resource Conservation and Recovery Act ("RCRA") regulations provides that "The standards in this part apply to owners and operators of all facilities which treat, store, or dispose of hazardous waste, except as specifically provided otherwise in this part or part 261 of this chapter." (10 CFR §264.1.)

53. The Broad Form Pollution Exclusion also provides that it does not apply to:

> **(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".
>
> **(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

54. The USLI Absolute Pollution exclusion contains identical language. Again, USLI has adopted language from the Broad Form Pollution Exclusion, which

applies only to industrial pollution, and without limitation. Further, the activities of monitoring, cleaning up, removing, containing, treating, detoxifying, and neutralizing pollutants, is again language drawn from environmental statutes and regulations. (*Id.* at §264.270.) Pursuant to insurance industry standards, the reasonable expectations of a policyholder would be that the USLI Absolute Pollution exclusion applies only to the industrial pollution.

55. It is also noteworthy that the definition of pollutants in the USLI Absolute Pollution exclusion expressly applies to "all substances specifically, identified or described by one or more of" various federal statutes or regulations which regulate industrial pollution.

56. USLI contends that the USLI Absolute exclusion is broader than prior pollution exclusions and includes non-industrial pollution. USLI contends that the following section in its exclusion demonstrates that wider application:"arising directly, indirectly, in concurrence with or in any sequence of out of the actual, alleged or threatened presence of or exposure to." Nowhere in this provision is a policyholder clearly advised, as required by insurance industry standards, that the USLI Absolute Exclusion applies to non-industrial pollution. Indeed, that is not even the purpose of this provision.

57. The purpose of the provision is to address the theory of concurrent causation. "Concurrent causation is defined as a single loss that was caused by two or more perils, occurring simultaneously or in succession. Concurrent causation becomes an issue when one of the perils is a covered peril and the other is not.” (Popow, §1.34.)

Pursuant to this approach "[i]f the loss is caused by a covered peril and a non-covered peril, the loss is covered if the "dominant," "efficient," "prime," or "moving" cause is a covered peril. (Popow, §1.35.)

58. Insurers have sought to avoid the application of concurrent causation by inserting anti-concurrent causation provisions in their policies. The anti-concurrent causation provisions commonly provide that "[w]e will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss." This is virtually the same provision touted by USLI as demonstrating that its exclusion applies to both non-industrial and industrial polluting events. In other words, USLI has inserted an anti-concurrent causation provision in the USLI Absolute Pollution exclusion so that a polluting event resulting from both a covered and noncovered cause would be covered. That is certainly not what is presented in this case. There is no allegation by USLI that the automobile accident was covered in any way under the Policy, while at the same time coverage for the accident was excluded by virtue of the USLI Absolute Pollution exclusion. USLI's anti-concurrent causation provision is not an expansion of coverage but rather a limitation of coverage that does not apply to this case.

**3. Application of the USLI Absolute Pollution Exclusion Applies Only to Traditional Industrial Pollution Accords With Policyholders' Reasonable Expectations of Coverage.**

59. Wollner describes the reasonable expectations doctrine as it is understood and applied in the insurance industry:

> The Reasonable expectations doctrine is mainly concerned with unfair surprise—the insertion of provisions that conflicts with what the policyholder would suppose based on the purpose of the insurance transaction. Under the concept, the text of a contract is de-emphasized and the objectively reasonable expectations of the consumer stressed in construing the contract language.
>
> The reasonable expectations doctrine takes into account the quality of communication. The main idea is to write an insurance policy that is as informative to the policyholder as the policy.
>
> (Wollner, p. 48.)

60. A corollary to the reasonable expectations doctrine is the recognition that policyholders generally do not understand the terms in an insurance policy. As Markham has pointed out, “insureds generally do not read their policies, and even if they do, the nature and extent of their coverages are not often fully understood.” (Markham, p. 12.) As a result, it is particularly appropriate to interpret insurance policies in accordance with the common understanding of insurance policy terms. In so doing, the insurance policy can be applied in harmony with the policyholder’s reasonable expectations.

61. The insurance industry is well aware of the rule of reasonable expectations and how it can and should be applied to claims. In the insurance industry, the insured’s reasonable expectations are described as follows:

> This doctrine [reasonable expectations] allows coverage to apply when the reasonable expectations of the insured would result in a claim payment, despite the lack of a policy provision excluding coverage or ambiguous language.
>
> . . .
>
> The doctrine places a burden on insurers to communicate coverage and exclusions of policies accurately and clearly.
>
> . . .

> The trend also seems to be that this doctrine is more likely to be successfully argued when courts find peculiar or atypical policy definitions or when exclusions remove the primary purpose of the insurance policy.
>
> (“Characteristics of Insurance Contracts,” IRMI, pp. 11–12.)

62. FC&S has also addressed an insured’s reasonable expectations at length.

> Two things are clear from the original outline of the doctrine: (1) the insured’s expectations of coverage must be *objectively* reasonable, and (2) the insured may be able to recover under a policy containing language that *unambiguously* excludes coverage.
>
> . . .
>
> [D]evelopment of the doctrine was necessary to protect individuals with little knowledge of insurance who buy standard, nonmanuscripted policies. For example, there has been some application of the doctrine to advertising brochures . . . where the brochures have seemed to indicate broad coverage that the policy exclusions substantially narrowed.
>
> . . .
>
> [T]he correct formulation of reasonable expectations should be as follows. Policy provisions should not be binding on an insured if:
>
> 1. The policy is an adhesion contract. [15]

---

[15] In the insurance industry, an adhesion contract is understood as a contract “that the insured must accept or adhere to the entire contract, with all of its terms and conditions. The insurer develops and promulgates the policy by itself, and the insured typically has to accept it in its entirety or reject it. The insurer has the clear advantage of writing the terms of the agreement to suit its particular needs and purposes. In most cases, the insured cannot insist or bargain that it be rewritten or that certain phrases be added or removed” (“Characteristics of Insurance Contracts,” IRMI, pp. 10–11.) Indeed, insurers commonly train their claims personnel on this and other important principles concerning insurance policy interpretation. Farmers, in its Personal Lines – Property training publication “The Insurance Contract,” notes that “[d]ue to the relationship between an insurance company and its insureds, as well as the social significance of insurance, insurance contracts are considered by the courts to be ‘contracts of adhesion’” (Id., p. 4.)

> 2. The enforcement of the provision would defeat the reasonable expectations of the great majority of policyholders who would have relevant claims.
>
> 3. The provision in question was not explained to the insured when he or she purchased the policy.[16]
>
> 4. The provision is either unclear and inconspicuous, misleading, obscure, or unfair, in that it either eviscerates any nonstandard terms specifically agreed to or eliminates the dominant purpose of the transaction.
>
> . . .
>
> [I]nsurance professionals will have to become increasingly vigilant about creating circumstances that might lead to a finding that reasonable expectations of coverage were created. Marketing materials need to be worded carefully as to not create expectations of coverage that the policy does not provide. Careful review of the policy with the insured, particularly the exclusions section, should become standard procedure for producers.
>
> ("Reasonable Expectations," FC&S, February 13, 2015.)[17]

---

[16] In this regard, it is important to note that, in the insurance industry, it is recognized that "insureds generally do not read their policies, and even if they do, the nature and extent of their coverages are not often fully understood" (Markham, p. 12.)

[17] Similarly, in the American Educational Institute, Inc. publication, "Fundamentals in Coverage and Claims Law" (AEI, 2002), the following is noted: "What the reasonable expectations rule does is allow the court to consider the policy language from the perspective of the insured who has purchased the policy and who often is unsophisticated in insurance matters and may not be aware of how policies work. If the exclusions to coverage are obscure or inconsistent with the coverage afforded in the insurance agreements of the policy, a court may, even if the exclusionary language itself is clear and unambiguous, interpret the policy to afford coverage to the insured if it is the insured's reasonable expectation that the policy provides coverage" (Id., p. 27, and see Wiening & Malecki, p. 379, "When the *reasonable expectations doctrine* is applied, an insurance policy is interpreted to provide the protection that the insured might reasonably have expected, even though that expectation is not clearly expressed in or supported by the policy"; emphasis in original).

63. As discussed *Supra*, the Modified Broad Form Pollution Exclusion uses terms that are commonly found in statutes regulating traditional environmental pollution; a literal interpretation of the Modified Broad Form Pollution Exclusion would result in eliminating otherwise longstanding coverage under the CGL, and the insurance industry itself has stated that its intent was to apply the Modified Broad Form Pollution Exclusion only to traditional industrial environmental contamination. Given these considerations, an insurance claims professional applying the Modified Broad Form Pollution Exclusion to the claims presented here, in accordance with insurance industry standards, should conclude that the policyholder would have a reasonable expectation of coverage for such claims. Such is the case with the claims for damage arising out of Itzhaki's operations.

**B. PURSUANT TO INSURANCE INDUSTRY STANDARDS, THE PREMISES LIMITATION ENDORSEMENT DOES NOT APPLY TO ITZHAKI'S CLAIM.**

64. The Premises Limitation Endorsement in the Policy provides in pertinent part:

> b. This insurance applies to "bodily injury" and "property damage" only if:
>
> (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place on or within the perimeter of the premises, (site(s) or location (s) scheduled above that are owned by, occupied by or leased to any insured.

65. It is first noted that nowhere in the numerous letters sent by USLI and its counsel from August 16, 2018, to January 8, 2020, did USLI ever raise this policy limitation. USLI's failure to timely advise Itzhaki of its coverage position is contrary to insurance industry standards. Insurance claims handlers are taught to advise the insured

of coverage defenses in order to avoid any risk of waiver or estoppel. As Markham has pointed out: "The insurance company's failure to advise the insured of the coverage problem at the beginning of the claim adjustment process will most likely prevent the company from later denying coverage to the insured." (Markham, p. 31.) In order to effectively advise the insured of such policy defenses, at the outset of the claim, the insurer should send the insured a reservation of rights letter which, among other things, contains a reference "to each policy provision that might preclude coverage, with an explanation of why such a provision may result in a coverage denial." (Liability Claim Practices, Jones, James R. (IIA, 1st ed. 2001) §4.8.)

66. There are important reasons for providing such detail in reservation of rights and denial letters.

First, such detail puts the policyholder on notice of the particular coverage issues and, thereby allows the policyholder to respond to the insurer and set forth the policyholder's views regarding coverage.

Second, detailed coverage position letters allow the policyholder to correct any misunderstandings of fact, or, most importantly, to remedy any deficiencies in the policyholder's own conduct, which may have implications for coverage.

Third, detailed coverage position letters avoid the risk that the insurer may waive or be estopped from asserting policy provisions. Insurance claims personnel are taught that detailed coverage position letters are necessary; otherwise there is a risk that the insurer will have waived or be estopped from asserting those coverage defenses not set forth in the coverage position letter.

67. USLI clearly violated the foregoing industry standard by failing to timely advise Itzhaki that it would assert the Premises Limitation Endorsement in support of its denial of coverage.

68. Further, the Premises Limitation Endorsement, by its own terms, and pursuant to insurance industry standards, does not apply to this claim. The provision limits coverage to occurrences that take "place on or within the perimeter of the premises." An occurrence is defined in the Policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The Policy does not contain a definition of "accident." Pursuant to insurance industry standards, and where a term is not defined in the policy, phrases and words in an insurance policy are "to be given their plain, ordinary meaning." (Olson, Robin K. & Scisiowski, Richard, J, Fundamentals of Insurance Law, (IRMI, June 2010), Chp. 7, "Rules of Policy Construction," p. 5.) Accordingly, it is presumed that the "parties [to the contract] meant to use the common, ordinary dictionary definition of the words they employ in their written contracts." (Id.). IRMI, a leading insurance industry resource, has pointed out that, "[a]n accident is "anything that occurs unexpectedly or unintentionally" (*American Heritage Dictionary*); "an unforeseen and unplanned event or circumstance; an unfortunate event resulting especially from carelessness or ignorance" (*Merriam Webster's Collegiate Dictionary*, 10th ed.); "an event which proceeds from an unknown cause, or is an unusual effect of a known cause, and therefore not expected" (*Webster's New Universal Unabridged Dictionary*, 2nd ed.). In other words, the focus is on the event or cause, and not the result. Here, the event as alleged in the complaint is the negligent grubbing which led to the release of the sand, dust, and dirt on the property.

This allegedly resulted in the automobile accident, which in turn resulted in a death and serious bodily injuries. The Premises Limitation Endorsement provides only that the accident or event take place on the designated property, which it allegedly did, and it does not require that the death and bodily injury also take place on the property.

69. This is particularly significant because ISO General Liability Policies have contained the following definition of occurrence:"... an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured." This definition provides that the occurrence includes both the accident or event, as well as the resulting "bodily injury." Accordingly, if this definition had been place in the Policy, it would arguably require that both the event and resulting injury take place on the described property for coverage to apply. This alternative definition has been in use for years before the Policy was issued, and, therefore, was known or should have been known, to USLI. Nonetheless, USLI chose not to use the alternative definition, and provide a definition of occurrence which requires only that the event take place on the designated property, which it did. USLI never excluded coverage where the event took place on the designated property but the bodily injury occurred off the property, which is the case here.

## C. PURSUANT TO INSURANCE INDUSTRY STANDARDS THE INDEPENDENT CONTRACTORS/SUBCONTRACTORS EXCLUSION DOES NOT APPLY TO ITZHAKI'S CLAIM FOR COVERAGE.

70. The Independent Contactors/Subcontractors Exclusion provides in pertinent part:

> I. It is agreed that this policy shall not apply to "bodily injury", "property damage", or "personal and advertising injury" arising out of the operations performed for any insured by any contractor(s) or acts or omissions of any insured in the selection, retention or supervision of any contractor(s).

71. USLI contends that the foregoing provision applies to support its denial of coverage because its insured contracted with a third party, Mr. Peralta, to "grub" the insured's land, which later resulted in the alleged release of sand, dirt, and dust that caused the automobile accident.

72. Application of insurance industry standards to the Independent Contractors/Subcontractors Exclusion, reveals that it does not apply to Itzhaki's claim for coverage. The term "contractor" is not defined in the Policy. Accordingly, and pursuant to insurance industry standards, it must be defined in its plain and ordinary meaning. (See *Supra*.) The word "contractor" is defined as "one who contracts or is a party to a contract: such as one that contractors to perform work or provide supplies." (https://www.merriam-webster.com/dictionary/contractor.) A contract is defined as a "binding agreement between two or more persons or parties especially: one legally enforceable if he breaks the contract, he'll be sued, " or "a document describing the terms of a contract." (https://www.merriam-webster.com/dictionary/contracts.)

73. The definitions of contractor and contract, which must be read together, describe the popular meaning of a contractor as one who enters into a formal contract to perform some work or service. This certainly would correspond to an insured's understanding of the term, which would mean someone who formally contracts for some form of work. This would be contrasted with part-time or occasional individuals who agree to perform certain work but without a formal contract. That is the case here. USLI

must apply the insurance contract in accordance with its popularly understood meaning, which would mean that Mr. Peralta is not a contractor as contemplated by this exclusion.

74. At the least, there is some ambiguity as to the extent of the contractor exclusion. Does it apply to anyone who agrees to perform any kind of work or only to contractors who enter into a "legally enforceable" agreement? Based on the available evidence, that is not the case here. Peralta appears to fit the definition of an occasional worker who works without any formal written contract. Accordingly, there is a substantial question as to whether the Independent Contractors/Subcontractors Exclusion applies to Ithaki's claims for coverage. Accordingly, USLI should have investigated this issue further and there is no evidence that it did so. Absent such investigation, the insured must be given the benefit of doubt of the coverage. Pursuant to insurance industry standards, "[i]f there is any reasonable doubt as the applicability of exclusion, the insured is entitled to the benefit of the doubt." (FC&S, "That Particular Part," June 2004.)

75. Further, it is well-recognized in the insurance industry that "ambiguity in a policy or coverage form may result in the insured being granted coverage because the insurance policy is a contract of adhesion" (Murdock, Michael T., <u>Claims Operations: A Practical Guide</u> [IRMI, 1st ed., 2010], p. 146.) Here, there is, at the least, a doubt as to the scope of the term "contractor" in the Independent Contractors/Subcontractors Exclusion. There is no evidence that USLI gave any consideration, as it should have done, to this ambiguity and afforded coverage. Pursuant to insurance industry standards coverage should have been afforded.

## V. CONCLUSION

76. The opinions expressed herein are subject to change or modification, depending on the results of any future investigation and discovery in this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and this Declaration is executed on March 18, 2021, at Berkeley, California.

Charles Miller

# EXHIBIT "A"

**CV**

Charles M. Miller, Esq.
INSURANCE LAW CENTER
1442A Walnut St. #55
Berkeley, CA 94709
Phone: (510) 549-9736
Fax: (510) 549-9726
Cell Phone: (510) 701-2963
E-Mail: cmiller.ilc@earthlink.net
EIN: 94-3335685

Expert Witness on Insurance
Claims Handling, Insurance Coverage,
Insurance Company Organization and Operations

The Insurance Law Center

The Insurance Law Center provides an exclusive combination of resources on insurance claims practices. These include:

- Extensive experience in testifying on insurance industry claims practices.
- Experience in testifying on insurance policy interpretation based on insurance industry publications.
- An extensive and unique library on insurance industry claims practices and policy interpretations that provide a sound basis for expert opinions.
- A one of its kind data base of well over one million pages of insurance company documents, depositions, manuals and policies and procedures that can be used in discovery as well as the basis for expert opinions.
- See attached for complete list of Insurance Law Center Services.

Experience:

Mr. Miller was employed by Fireman's Fund Insurance Company for eighteen years in insurance claims. Mr. Miller has held several insurance claims positions, including senior adjuster, branch office general adjuster, and claims manager. Mr. Miller also managed an asbestos claims facility and a nationwide major claims unit. Mr. Miller has practiced insurance law since 1990. Mr. Miller has extensive experience with the interpretation and application of first- and third-party insurance policy forms.

Since 1997, Mr. Miller has been retained in over 200 cases in at least fifteen states and territories (federal and state courts) as an expert on insurance coverage and claims handling, including cases concerning construction defects, first-party fire and water losses, disability claims, automobile liability including underinsured and uninsured motorist claims, professional liability claims, claims under various automobile insurance policies, comprehensive commercial liability policies, and excess and umbrella policies. Mr. Miller has been retained in both federal and state courts, including those in Arizona, California, Idaho, Nevada, New Mexico, South Carolina, Pennsylvania, Florida, the U.S. Virgin Islands, Washington, Oregon, Utah, Arkansas, Missouri, Mississippi, South Carolina, Louisiana, Massachusetts, West Virginia, and Toronto, Ontario, Canada. Mr. Miller has been qualified as an expert on insurance industry claims handling standards and practices in Arizona, Nevada, Arkansas, Idaho, Florida, Colorado, Hawaii, New Mexico, Ohio, Missouri, Louisiana, Washington, Kansas, Texas, South Carolina, West Virginia, and California.

Insurance Industry Experience:

1972-l980

- Held several positions at Fireman's Fund Insurance Company, including Senior and Branch Office General Adjuster.

- Experienced in the handling of first-party claims, including claims arising out of collision losses, theft losses, residential fires, and burglaries from commercial establishments.

- Experienced in handling a wide variety of commercial and personal liability claims, including construction and auto accidents, underinsured and uninsured motorist claims, environmental claims, construction defects, and personal injury claims.

- Responsible for the management and supervision of litigation.

1980-1986

- Managed insurance company asbestosis claims facility. Responsible for the supervision of litigation, investigation, and evaluation of over 600 claims for asbestosis-related injuries.

- Continued responsibility for the handling, investigation, and resolution of both third- and first-party claims as Branch Office General Adjuster.

1986-1990

- Managed insurance company major claims unit.
- Responsible for nationwide management of a variety of specialized claims, including construction defect, investment advisors professional liability, and sexual discrimination and harassment.
- Responsibilities included interpretation of insurance policy provisions and management of insurance coverage declaratory relief actions brought by either the policyholder or the company.

Legal Practice:

| | |
|---|---|
| 2004-Present | Insurance Law Center, Berkeley, California |
| 2000-2004 | Special Counsel, Wendel Rosen Black & Dean, Oakland, California. |
| 1998-2000 | Law Office of Charles M. Miller, San Francisco, California |
| 1995-1998 | Associate, Gray Cary Ware & Freidenrich. Practice in Insurance Litigation |
| 1992-1995 | Associate, Pettit & Martin |
| 1990-1992 | Associate, Heller, Ehrman, White & McAuliff |

Education:

| | |
|---|---|
| University of San Francisco | 1990 J.D. (Magna Cum Laude) Law Review |
| Western Washington University | 1970-1971 Masters Studies Political Science |
| Western Washington University | 1970 B.A. Political Science (President's List) |

Insurance Training:

Insurance Institute of America, Associate in Claims

Attendance at seminars, conventions, and other programs put on by insurance industry organizations covering a variety of topics related to insurance claims handling and insurance policy interpretation and application.

Teaching and Presentations:

"Insurance Issues and COVID-19 Part III," Trial Guides Webinar, July 31, 2020.

"Post Loss Duties," AAJ Annual Meeting, July 14, 2020.

"Insurance Issues and COVID-19," Trial Guides Webinar, May 27, 2020.

"Corona Virus And Insurance Coverage," New Mexico TLA Webinar, May 8, 2020

"COVID-19 and Insurance Business Interruption Claims," Colorado TLA Webinar, April 27, 2020.

"Insurance Issues and COVID-19," Trial Guides Webinar, April 1, 2020.

First Party Claims Conference, FPCC, "Handling The Insurance Claim Prior to Litigation," October 2019, Providence, RI.

First Party Claims Conference, FPCC, "Addressing Policyholders Claims in an Ethical Manner with Insureds and Insurance Companies when Experts are Involved," March, 27, 2019, Marina De Rey, CA.

Back to School in Insurance Law Seminar, NM TLA, "Insurance Industry Practices in Handling First Party Claims," and ""Use of Experts in Support of Claim Denials," Feb. 22, 2019, Albuquerque, NM.

Oct. 2018, "Insurer's Use of Experts in First Party Claims," First Party Claim Conference, Providence, RI.

March 2017, "Developing the UM/UIM Claim," New Mexico TLA Annual Insurance Law Seminar

August 2016, "Discovery in Bad Faith Cases," and "Institutional Bad Faith," Montana TLA, Missoula, Mt.

August 2016, "Institutional Bad Faith," AAJ Convention, Los Angeles.

First Party Claims Conference, FPCC , March 2016, "Anatomy of a Bad Faith Case."

February 2016, "Discovery in Bad Faith Cases," and "Institutional Bad Faith," New Mexico TLA Annual Insurance Law Seminar.

January 2016, “Institutional Bad Faith,” Washington State AJ annual insurance law seminars, Seattle and Spokane, WA.

June 10, 2014, Farmers Organization and Claims Operation, Farmers Annual Agent’s Association Meeting, Las Vegas, NV.

October 2013, "Use of Experts in Insurance Bad Faith Cases," First Party Claim Conference, Providence, RI.

April 2013, "Use of Experts in Insurance Bad Faith Cases," North Carolina Bar Association program, "Why Do We Call It 'Bad Faith'?", Charlotte, NC.

March 2013, NAPIA/CAPIA Conference, "The Wear and Tear and Similar Exclusions in Wind and Water Damage Claims."

April 2012, "Bad Faith Issues In Business Interruption Claims," ABA Property Insurance Law Section, Los Angeles, CA.

September 2012, "Use of Experts in Insurance Bad Faith Cases," UTAH TLA, Salt Lake City, UT.

August 2011, "Developments In Insurance Claims Practices," AAJ, New York, NY.

August 2009, "Insurance Bad Faith and Settlement Institute," Advocacy Institute, Las Vegas, NV.

December 2009, "Insurance Coverage for Chinese Drywall Claims," Testimony before the NAIC Catastrophe Insurance Working Group, San Francisco, CA.

May 2009, "Presenting the Coherent Case," Claims Practices Seminar, Miami, FL.

October 2008, "Issues in Insurance Claims Practices," Claims Practices Seminar, Reno, NV.

September 2008, Presentations on Ethics and Claims Adjusting, Western Regional PLRB Convention, Sacramento, CA.

May 2008, Presentations on Ethics and Claims Adjusting, Eastern Regional PLRB Convention, Tampa, FL.

November 2007, "Issues in Insurance Claims Practices," Claims Practices Seminar, Reno, NV.

October 2006, "Issues in Insurance Claims Practices," Claims Practices Seminar, Deadwood, SD.

June 2006, "Discovery in Insurance Bad Faith Cases and Related Issues," Mississippi TLA, Memphis, TN.

April 2006, "Insurance Industry Claims Practices," Claims Practices Seminar, Reno NV.

April 2006, "Institutional Bad Faith Issues and Pay for Performance in the Insurance Industry," Ontario TLA, Toronto, Ontario, Canada.

May 2005, “Discovery in Insurance Bad Faith Cases and Related Issues,” North Dakota TLA, Fargo, ND.

November 2004, “Insurance Industry Claims Practices,” Claims Practices Seminar, Reno, NV.

September 2004, “Discovery in Insurance Bad Faith Cases and Related Issues,” Utah TLA, Salt Lake City, UT.

September 2004, “Institutional Bad Faith Issues and Pay for Performance in the Insurance Industry,” New Mexico TLA, Albuquerque, NM.

July 2004, “Incentive Pay’s Effect on Claim Practices,” Claims Practices Seminar, Reno, NV.

May 2004, “Recognizing Improper Claim Practices,” Claims Practices Seminar, Deadwood, SD.

April 2004, “Discovery in Insurance Bad Faith Cases and Related Issues,” Arkansas TLA, Little Rock, AR.

February 2004, “Incentive-Driven Claim Practices,” Claims Practices Workshop, Reno, NV.

December 2003, “Non-Rate Action Plans,” Claims Practices Workshop, Reno, NV.

June 2003, “Claim Practices Cases – Looking Ahead,” Claims Practices Workshop, Reno, NV.

March 2003, “Claim Practices in Non-Rate Marketing Actions,” Claim Practices Workshop, Reno, NV.

January2003, “Farmers Ins. Group Corporate Organization and Operations,” WTLA, Seattle, WA.

November 2002, “The Effects of Performance-Based Pay for Adjusters,” Claim Practices Workshop, Reno, NV.

May 2002, “SFXOL – Settle for X or Less,” Property-Casualty Claim Practices Workshop, Reno, NV.

December 2001, “A de novo Review of Claim Practices,” Property-Casualty Claim Practices Workshop, Reno, NV.

1993-1996, Presented updates on Environmental Insurance Law at Santa Clara County Annual Environmental Law Update Conferences.

1992-1995, Presentations on environmental and insurance law issues at Federal Publications Seminars in Los Angeles, Phoenix, San Francisco, and Sacramento.

1972-1990, During employment in the insurance industry, responsible for the presentation of several courses and lectures on various aspects of insurance claims handling.

Organizations:

California Bar Association

American Bar Association

San Francisco Bar Association

American Association for Justice

Consumer Attorneys of California

Alameda Bar Association

San Francisco Trial Lawyers Association

Publications:

"Cleanup Claim," *San Francisco Daily Journal*, October 19, 1998

"Just The Facts, Just the Facts: Discovery in Insurance Bad Faith Cases" *Forum,* May 2005.

"Discovery in Insurance Bad Faith Cases," 2005, Utah TLA

"Proving Insurance Bad Faith," *The Litigator*, Fall 2005

"Discovery in Insurance Bad Faith Cases, Part I," *The Litigator*, Winter 2006

"Discovery in Insurance Bad Faith Cases, Part II," *The Litigator*, Spring 2006

"The Insurance Company Deposition in Insurance Bad Faith Cases," *The Litigator*, Winter 2006

"The Use of Experts in Insurance Bad Faith Cases," *The Litigator*, Summer 2006

"The Use of Experts in Insurance Bad Faith Cases," *Forum*, March 2007

"Protesting Insurer Protective Orders," *Trial*, July 2007

"Behind the Scenes in the Insurance Industry: How the Insurance Industry Has Revolutionized Claims Handling," *Forum*, June/July 2007

"Behind the Scenes in the Insurance Industry: How the Insurance Industry Has Revolutionized Claims Handling," *Louisiana Advocates,* Aug. 2008, Vol. XXIII, No. 8.

"The Scope of Expert Testimony in Insurance Bad Faith Cases: Can the Expert Testify on the Meaning of the Insurance Policy*," Conn. Ins. Law Journal*, 15(1) (2008-2009), p. 211.

"Professional Liability Claims: The Risk Professional's Role," *The Risk Report,* Vol. XXXII, International Risk Management Institute ("IRMI"), June 2010

"Behind the Scenes in the Insurance Industry," *Trial Trends*, Spring 2011

"Key Coverage Issues in Personal Lines Claims: The Rules of Insurance Contract Interpretation," IRMI, May 2011

"Key Coverage Issues in Personal Lines Claims: The Duty To Defend ," IRMI, May 2011

"Key Coverage Issues in Personal Lines Auto Claims: Auto Coverage for Using or Occupying a Vehicle," IRMI, May 2011

"Key Coverage Issues in Personal Lines Auto Claims: When Is a Driver a Permissive User?" IRMI, May 2011

"Key Coverage Issues in Homeowner's Claims: The Wear and Tear Exclusion," IRMI, September 2011

"Key Coverage Issues in Homeowners' Claims: When Is a Collapse a Collapse?", IRMI, September 2011

"The Cooperation Clause: When Is There Cooperation and When Is There Not?", IRMI, April 2012

"When Are Emotional Distress Claims Bodily Injury?", IRMI, April 2012

"Evaluating Serious Injury Claims Under Personal Lines Policies," IRMI, 2012

"Negligent Entrustment: Liability and Coverage," IRMI, 2012

"The Water Damage Exclusion," IRMI, 2013

"The Business Pursuits Exclusion," IRMI, 2013

"Concurrent Causation in First Party Property Claims," IRMI, September 2013

"The Homeowners Policy Ensuing Loss Provision," IRMI, September 2013.

“Behind the Scenes in the Insurance Claims Industry: How Insurance Companies Have Revolutionized Insurance Claims Handling, An Update,” *Forum,* 46(1), January/February 2016, p. 22

“Behind The Scenes in the Insurance Claims Industry: How Insurance Companies Have Revolutionized Insurance Claims Handling, An Update,” *The New Mexico Trial Lawyer*, 47(2), March/April 2016, p. 1.

"Bad Faith: Revisiting an insurer's affirmative duty to settle," *Advocate,* Sept. 2016, p. 72.

"The Obligation of Insurers to Pay The Undisputed Amount of Underinsured And Uninsured Motorists' Claims," *Advocate,* Sept. 2017.

"The Homeowner's Policy and the Debate Over Cosmetic Damage," IRMI, September 2017.

"Like Kind and Quality: It's Meaning and Application," IRMI, January 2018.

"Appraisal Process: Scope of Loss and Causation Included?," ABA/TIPS/PILC Newsletter, Summer, 2018.

"Current Issues in first-party property claims," *Advocate*, Sept, 2018, p. 76.

"Depreciation of Labor in Property Damage Estimates," IRMI, Oct. 2018.

"The Homeowners Policy Ensuing Loss Provision," IRMI, Oct. 2018.

"Handling the Wild-Fire Insurance Claim Prior to Litigation," *Advocate*, March 2019

"Burned Out And Underinsured," *Advocate*, Sept. 2019.

"Professional Liability Claims Management: The Role of The Risk Manager, Agent or Broker," IRMI, April 2020.

"Business-income Insurance and Covid-19," *Advocate*, July 2020.

Opinions Cited In:

*Gerawan Farming Partners, Inc., v. Westchester Surplus Lines Ins. Co., et al.*, (Jan. 4, 2008) 2008 WL 80711 (E.D. Cal.)

*Bruce D. Bell, et al. v. Dietz-Crane Builders LLC, et al.*, Maricopa Cty., AZ, June 12, 2008

Recommendations:

Provided upon request.

# EXHIBIT "B"

August 5, 2019

**VIA EMAIL:aggieitzhaki@gmail.com**

Rontal Development LP
dba: The Agnes Itzhaki Living Trust
Established November 1990
Attn: Agnes Itzhaki
12334 Sunset Boulevard
Los Angeles, CA 90049

Re: ***Holly Takas et al. v. Rontal Development, LP et al.***
Kern County Superior Court Case No. BCV-19-101351

| | |
|---|---|
| Claim #: | K125159 |
| Insured: | Rontal Development LP dba: The Agnes Itzhaki Living Trust Established November 1990 |
| Policy #: | CL 1786660A |
| Policy Period: | December 8, 2017 to December 8, 2018 |
| Claimant: | Holly Takas, Paul Nielsen, Elijah Nielsen, Zoey Takas |
| Date of Loss: | April 18, 2018 |

Dear Ms. Itzhaki:

As you are aware, I am the Claims Examiner assigned to handle the above-referenced claim, which was tendered to United States Liability Insurance Company ("USLI") under Commercial General Liability Policy No. CL 1786660A (the "Policy") issued to Rontal Development LP dba: The Agnes Itzhaki Living Trust Established November 1990 (the "Insured"). This letter sets forth USLI's coverage position with respect to the above-referenced action (the "Action").

Please be advised that based on the information presently available to USLI, USLI has no duty to defend or indemnify the Insured or you under the Policy with respect to the Action because: (1) the damages alleged in the Action arose from operations performed by a contractor for the Insured, and are excluded by the Policy's Independent Contractors/Subcontractors Exclusion (form L 278); and (2) the damages alleged arose out of the presence of or exposure to severe dust, which constitutes a "pollutant" as that term is defined in the Policy, and are thus excluded by operation of the Policy's pollution exclusion. Furthermore, certain of the defendants named in the complaint, including Rontal Development and Rontal Development, LLC are not insureds under the Policy, and you are an insured only to the extent liability is asserted against you with respect to the conduct of the Insured's business.

Below are the facts and information upon which USLI has based its coverage determination. If, after reviewing this letter, you believe that USLI's understanding of the facts is incomplete or inaccurate, or there is any additional information you believe would bear on USLI's coverage analysis, please advise as soon as possible so that we may consider any new or different information and its effect, if any, on USLI's coverage position.

**FACTUAL BACKGROUND**

This claim arises from an automobile accident that occurred on a roadway adjacent to a parcel of land owned by the Insured and listed in the Policy as the designated premises (the "Itzhaki Property"). On May 15, 2019, Holly Takas, Paul Nielsen, Elijah Nielsen, and Zoey Takas (collectively "Plaintiffs") filed a complaint in Kern County Superior Court against various defendants, including the Insured, you, the City of California City, and Lou Peralta. Through their complaint, Plaintiffs seek to recover damages arising from the death of Kody Arthur Nielsen, as well as for severe injuries to Paul Nielsen and Elijah Nielsen.

Plaintiffs allege that during the morning of April 12, 2018, wind conditions in the area of the Itzhaki Property became severe, causing dirt and dust particles to become airborne, significantly limiting visibility on Neuralia Road in California City adjacent to the Itzhaki Property. (Complaint at ¶ 20.) The complaint alleges that as many as 30 calls were made by citizens to various personnel of California City to warn of the danger, but the City took no steps to close the road or eliminate the dangerous conditions in any way. (Complaint at ¶¶ 21, 25.) Despite the wind, the complaint alleges that the visibility on Neuralia Road was clear except at the Itzhaki Property, where visibility had been reduced to 12 feet due to airborne dust, sand, and gravel blowing in the wind emanating from the Itzhaki Property. (Complaint at ¶ 22.) As a result of the limited visibility, the decedent was involved in a head-on motor vehicle collision on Neuralia Road adjacent to the Itzhaki Property, killing him and severely injuring his passengers, Paul Nielsen and Elijah Nielsen. (Complaint at ¶ 28.)

Plaintiffs allege that prior to the accident, on or about March 15, 2018, the Insured and Mr. Peralta graded the Itzhaki Property, removing the ground cover vegetation and loosening the soil. (Complaint at ¶ 18.) The complaint alleges that this grading was performed without a permit which led to a citation, and caused an excessive dust condition creating a road hazard. (*Id*.)

Due to Kody Arthur Nielsen's death, Plaintiffs claim that they have been deprived of the decedent's moral support, society care and comfort, and financial support, as well as loss of future earnings. (Complaint at ¶¶ 40-41.) Plaintiffs also seek to recover general damages for the injuries sustained by Paul Nielsen and Elijah Nielsen. (Complaint at ¶ 38.) The complaint also seeks punitive damages against the Insured. (Complaint at ¶ 50.)

During the course of USLI's investigation, USLI was provided with a series of e-mail messages from March 15, 2018 to April 12, 2018 between you, Bruce Watkins, Mr. Peralta, and the local government regarding grubbing permits and processes.

-On March 15, 2018 Bruce Watkins wrote to Bob Stockwell at the California City government office to advise of confusion regarding a permit for grubbing. Lou Peralta who was performing the grubbing, was advised that the work being done was not permitted without a permit application. Mr. Peralta advised Mr. Watkins that he had done grubbing around California City for years, and his understanding was that he did not need a permit. Mr. Watkins requested a meeting with Mr. Stockwell to discuss the permit issue.

-Lou Peralta attempted to get a permit but was advised he could not get a permit because he was not the owner

-In an April 12th email Bruce Watkins writes to Bob Stockwell advising that the property owner was told to contact the California Department of Fish and Wildlife, the Water Board and the Air Resources Board. This is a new process issued by the State of California. However, this procedure does not address the grubbed debris that is still on the land. Mr. Wakins requests a solution before the wind blows the debris any further.

Based on the foregoing e-mail messages, our recent communications, and other information that USLI has obtained through its investigation, USLI understands that the Insured actually retained Mr. Peralta to grub the Itzhaki Property (*i.e.*, to remove trees and shrubs, clean the property of trash, and water it down) rather than to grade it.

The e-mail messages indicate that the Insured was informed that the grubbing activity on the Itzhaki Property in March 2018 could not be conducted without a permit and that the Insured (through Mr. Watkins and others) were in communications with the local government about the permit application process.

You advised USLI that the citation referenced in the complaint was issued for land clearing without a permit.

Additionally, you have advised that there is no written contract between the Insured and Mr. Peralta, but that he has performed clearing services for the Insured at least twice, and clean-up services at least three times. Mr. Peralta has performed grubbing services for other properties owned by you and/or the Insured, and Mr. Peralta has performed grubbing for other parties all around California City for years. USLI understands that because Mr. Peralta was not the owner of the Itzhaki Property, the local government informed him in March 2018 that he could not obtain the relevant permitting papers and that he needed written permission from the owner to perform any clean-up, grubbing or grading, which written permission must be in Mr. Peralta's possession at all times. Over the past several years, the Insured has paid Mr. Peralta a total of $13,300, but it has not issued him either a W-2 or 1099 tax form.

USLI has also learned that the Insured was cited for violation of the Eastern Kern County Air Pollution Control District for fugitive dust. The violation occurred on February 11, 2018, but notice of the violation was not issued until May 11, 2018.

By summarizing the allegations above, USLI takes no position on the truth or falsity of those allegations.

## POLICY INFORMATION

USLI issued the Policy, effective from December 8, 2017 through December 8, 2018, to named insured Rontal Development LP dba: The Agnes Itzhaki Living Trust Established November 1990. The Policy provides Commercial General Liability coverage with limits of $1,000,000 per occurrence subject to a $2,000,000 aggregate.

The Policy's insuring agreement as set forth in form CG 00 01 (12/07) Commercial General Liability Coverage Form provides as follows:

**SECTION 1 COVERAGES**
**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
**1. Insuring Agreement**
**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. …

The Policy's **Section II – Who Is An Insured** states, in pertinent part:

1. If you are designated in the Declarations as:
...
b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

The Policy's Declarations page describes the insured's form of business as "Partnership".

The Policy contains the following exclusion, as amended by endorsement:

**2. Exclusions**

This insurance does not apply to:

…

**f. Pollution, Organic Pathogen, Silica, Asbestos and Lead**

(1) "Bodily injury" or "property damage"; …

arising directly, indirectly, in concurrence with or in any sequence out of the actual, alleged or threatened presence of or exposure to, ingestion, inhalation, absorption, contact with discharge, dispersal, seepage, release or escape of "pollutants", "organic pathogens", "silica", asbestos, or lead, whether or not any of the foregoing are (1) sudden, accidental or gradual in nature; (2) intentional; or (3) expected or intended from the standpoint of the insured.

The Policy also includes form L 278 (11/07) Independent Contractors/Subcontractors Exclusion, which is attached to the Policy, provides in relevant part:

It is agreed that this policy shall not apply to "bodily injury", "property damage", or "personal or advertising injury" arising out of the operations performed for any insured by any contractor(s) or acts or omissions of any insured in the selection, retention or supervision of any contractor(s).

…

Form L 532 (08/03) EXCLUSION – CONSTRUCTION OPERATIONS, which is included in the Policy, provides:

This insurance does not apply to "bodily injury", "property damage", or "personal and advertising injury", or medical expenses arising out of any construction, "construction services", demolition, renovation or site preparation.

"Construction services" includes, but is not limited to, surveying, drafting, test borings, or inspections.

Furthermore, **Section V – Definitions** of the Policy, as amended by endorsement, provides the following relevant definitions:

3. "Bodily injury" means:

a. bodily injury,
b. sickness,
c. disease; or
d. mental anguish or emotional distress arising out of a., b., or c., above,

sustained by a person, including death resulting from any of these at any time.

…

15. "Pollutants" mean[s] any solid, liquid, gaseous, bacterial, fungal, electromagnetic, thermal or other substance that can be toxic or hazardous, cause irritation to animals or persons and/or cause contamination to property and the environment including smoke, vapor, soot, fumes, acids, alkalis, chemicals, toxic materials, "volatile organic compound" and gases therefrom, radon, combustion byproducts and waste. Specific examples identified as pollutants include, but are not limited to, diesel, kerosene, and other fuel oils … carbon monoxide, and other exhaust gases … mineral spirits, and other solvents … tetrachloroethylene, perchloroethylene (PERC), trichloroethylene (TCE), methylene chloroform, and other dry cleaning chemicals … chlorofluorocarbons, chlorinated hydrocarbons, adhesives, pesticides, insecticides … and all substances specifically listed, identified, or described by one or more of the following references: **Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) Priority List Hazardous Substances (1997 and all subsequent editions), Agency for Toxic Substances And Disease Registry ToxFAQs™, and/or U.S. Environmental Protection Agency EMCI Chemical References Complete Index**.

"Silica" means silica in any form and any of its derivatives, including but not limited to silica dust, silicon dioxide, crystalline silica, quartz, or non-crystalline (amorphous) silica.

## USLI'S COVERAGE POSITION

As more fully discussed below, USLI has no obligation to provide the Insured or you with a defense to the Action, or to indemnify the Insured or you relative to the Action.

First, the Policy's Independent Contractors/Subcontractors Exclusion (form L 278) bars coverage for damages arising out of operations performed for any insured by any contractor, or for acts or omissions of any insured in the selection of any contractor. Based on the information available to USLI, Mr. Peralta was a contractor who was retained by the Insured to perform grubbing services on the Itzhaki Property. USLI understands that Mr. Peralta has been performing grubbing services for other parties throughout California City for years, and his services have been retained by the Insured as needed. Because the damages alleged in the Action arose from operations performed for the Insured by a contractor, this exclusion bars coverage under the Policy for the Action.

Second, the Policy's pollution exclusion also precludes coverage for the Action, as the damages alleged arose out of the presence of or exposure to severe dust, which constitutes a "pollutant" as that term is defined in the Policy.

In addition to the Insured, the complaint names you as an individual, Rontal Development (a business entity of form unknown), and Rontal Development, LLC as defendants. The entities Rontal Development and Rontal Development, LLC are not insureds under the Policy. Furthermore, to the extent liability is asserted against you other than with respect to the conduct of the Insured's business, you are not an Insured under the Policy.

Coverage for the Action may be further limited or excluded entirely by other Policy provisions. For instance:

- To the extent that the damages alleged in the complaint arose from the grading or site preparation of the Itzhaki Property, coverage for the Action would also be barred under the Policy pursuant to the Construction Operations Exclusion (form L 532).

- To the extent punitive damages are awarded against the Insured, such damages are uninsurable under California law.

**CONCLUSION**

USLI's coverage position is based on the information presently available to it. This letter is not, and should not be construed as, a waiver of any terms, conditions, exclusions or other policy provisions, of any insurance policy issued by USLI. The discussion above is not intended to be an exhaustive statement of every issue regarding the availability or scope of coverage under the Policy. USLI expressly reserves all its rights under the Policy, in law and in equity, to deny or limit coverage on the foregoing basis and to deny coverage on any such additional and alternative basis as may be subsequently discovered. If you have additional information which should be considered in our decision, please forward the information to pour attention.

If the Insured believes any aspect of this coverage claim has been wrongfully declined, it may seek review of USLI's decision by contacting the California Department of Insurance at the following address and telephone numbers:

California Department of Insurance
Claims Service Bureau
300 S. Spring Street, 11th Floor
Los Angeles, California 90013
(800) 927-HELP or (213) 897-8921

The statute of limitations in California for the Insured to bring suit against USLI is four years from the date of any loss caused by USLI. If the Insured believes USLI has

incorrectly declined coverage and it fails to bring suit within this period of time, its right to contest USLI's coverage decision is waived.

Should you have any questions or concerns regarding this matter, please do not hesitate to contact me.

Sincerely,



Cheryl Hazard
Claims Examiner
1-888-523-5545 Ext: 2221
chazard@usli.com

Copy to: Randy Frankel via email: Rfrankel@frankelinsurance.com

SGD
Insurance Adjusters • Investigators • Administrators

August 16, 2018

Via both US mail and email

Frankel & Associates Insurance Services, Inc.
9233 W. Pico Blvd., Suite 226
Los Angeles, CA 90035
Attention: Randy Frankel

bbanks@frankelinsurance.com

| | | |
|---|---|---|
| Re: Insured | : | Rontel Development<br>Agnes Itzhaki |
| Insurer | : | USLI |
| Policy No. | : | CI 1786660A |
| Claim No. | : | K125129 |
| Date of Loss | : | April 12, 2018 |
| Loss Location | : | California City, CA |
| Our File No. | : | SY400751 |

Mr. Frankel:

Thank you for our conversation of August 2, 2018.

United States Liability Insurance Company and I will need Ms. Itzhaki's assistance and cooperation in conducting and completing the investigation of this claim so that it may provide you with the indemnity to which she is entitled. I will do everything I can to make the task of completing the investigation and submitting the proof of your loss to United States Liability Insurance Company with as little difficulty and effort as possible.

When we spoke on August 2, you stated that you would email to me evidence of the above loss. I have received nothing to date.

Please forward to me anything that you have as to this incident, and/or the contact information for the insured's manager, which was previously request.

Neither this letter nor any investigation conducted by Schifrin, Gagnon & Dickey into the facts of the above-captioned loss is intended as, nor should it be construed as, a waiver of any of the terms, conditions or provisions of the policy of insurance under which we are presently working, a waiver of any of your obligations thereunder, a waiver of any defenses now or hereafter available to our principal, nor is it an admission or denial of liability.

We look forward to working with you. Should you have any questions, or wish to discuss any aspect of the claim, please to not hesitate to call or email.

Yours very truly,

SCHIFRIN, GAGNON & DICKEY, INC.

Henry Velasco/hv

Henry Velasco
Senior Liability Adjuster
(818) 721-4708, ext. 138
hvelasco@sgdinc.com

Cc:

Agnes Itzhak
705 N. Camden Dr.
Beverly Hills, CA 90210

LAW OFFICES OF
SACRO & WALKER LLP
700 NORTH BRAND BOULEVARD, SUITE 610
GLENDALE, CALIFORNIA 91203
TEL: (818) 721-9597
FAX: (818) 721-9670
www.sacrowalker.com

JENNIFER YU SACRO
Direct Dial: (818) 629-0844
E-mail: jsacro@sacrowalker.com

August 21, 2019

**VIA EMAIL (rfrankel@frankelinsurance.com) ONLY**

Mr. Randle M. Frankel
Frankel & Associates Insurance Services
9233 West Pico Boulevard, #226
Los Angeles, California 90035

**Re:** ***Holly Takas et al. v. Rontal Development, LP et al.***
Kern County Superior Court, Case No. BCV-19-101351 (the "Action")

| | |
|---|---|
| Insured: | Rontal Development LP dba: The Agnes Itzhaki Living Trust Established November 1990 (the "Insured") |
| Claimants: | Holly Takas, Paul Nielsen, Elijah Nielsen, Zoey Takas |
| USLI Policy No.: | CL 1786660A, eff. December 8, 2017 to December 8, 2018 (the "Policy") |
| USLI Claim No.: | K125159 |

Dear Mr. Frankel:

Our firm represents United States Liability Insurance Company ("USLI") with respect to the above-referenced claim. Please accept this letter as an initial response to your August 6 and 19, 2019 e-mail messages to USLI's Cheryl Hazard.

First, we note that your August 6 e-mail message makes certain representations regarding the Insured's business relationship with Lou Peralta that appear to be inconsistent with the information that that USLI obtained in its investigation of the claim, including information that USLI obtained directly from the Insured. While we understand that you are the Insured's broker, kindly confirm whether you also are the Insured's appointed agent with express authority to make binding legal admissions on the Insured's behalf, such as admissions with respect to the Insured's business relationship with Mr. Peralta.

Second, as noted above, your August 6 e-mail message asserts that the Insured hired Mr. Peralta, who undertook the grubbing work on the designated premises, as an employee. However, your email provides no information in support of this position. The information available to USLI indicates that Mr. Peralta was a contractor retained by the Insured from time to time on an as-needed basis. As set forth in USLI's August 2, 2019 coverage position letter, Mr. Peralta

performed land clearing and clean-up services for the Insured at various times, but also did grubbing for others around California City for years. In addition, the Insured paid Mr. Peralta a total of only $13,300 over several years, and he was not issued either a W-2 or 1099 tax form by the Insured. To USLI's knowledge, the Insured is not in the grubbing or land clearance business; the Policy declarations identify the Insured's business description and classification as "Vacant Land." So that USLI may take such information into consideration, please provide us the following documents and other information on the Insured's behalf:

1. Mr. Peralta's dates of employment with the Insured and job description.

2. The Insured's employment records for Mr. Peralta, such as: (a) a record of the dates and hours worked by Mr. Peralta, including any overtime; (b) a copy of all checks or other records reflecting the Insured's payment for Mr. Peralta's wages and expense reimbursements; and (c) a record of all checks or other records reflecting the Insured's payment of any payroll taxes for Mr. Peralta, such as unemployment insurance, State disability and income tax withholdings.

3. The name of the Insured's worker's compensation insurer and a copy of the Insured's workers compensation insurance policies effective while Mr. Peralta was employed by the Insured.

4. Information regarding whether the Insured is engaged in the grubbing business and, if so, the date it began such business and its gross income each year from such business.

With respect to facts regarding the windstorm, the Complaint filed in the Action includes allegations identifying Mr. Peralta's work performed at the Insured's property as the cause of the visibility conditions that gave rise to the accident. *See* Complaint at ¶¶ 18-28. For purposes of its coverage analysis, USLI must assume that these allegations are true, as there is no other alleged basis for liability to attach to the Insured.

By investigating this matter in furtherance of the Insured's request that USLI reconsider its coverage position, USLI is reserving all of its rights and defenses it may have under the Policy and/or applicable law. This communication is not, and should not be construed as, a waiver of any terms, conditions, exclusion, or other provisions of the Policy, or any other insurance policies issued or allegedly issued by USLI or any of its affiliates. This communication is not, and should not be construed as an agreement by USLI to any expenditure of funds.

We appreciate the Insured's cooperation regarding this matter, and look forward to receiving the additional requested information. In the meantime, if you have any questions or concerns, please do not hesitate to contact me.

Very truly yours,

SACRO & WALKER LLP

JENNIFER YU SACRO

cc: Ms. Agnes Itzhaki, Rontal Development LP dba: The Agnes Itzhaki Living Trust (via e-mail, aggieitzhaki@gmail.com)

P
M
PARKER
MILLS LLP
TRIAL LAWYERS
BUSINESS LAWYERS

Mark A. Graf
Direct Dial: (213) 417-3677
graf@parkermillsllp.com

October 30, 2019

**VIA E-MAIL**

Ms. Cheryl Hazard
Claims Examiner
USLI
1190 Devon Park Drive
P.O. Box 6700
Wayne, PA 19087
E-mail: chazard@usli.com

| | | |
|---|---|---|
| ***Re:*** | ***Claim No.:*** | ***K125159*** |
| | ***Policy No.:*** | ***CL 1786660A*** |
| | ***Insured:*** | ***Rontal Development LP dba: The Agnes Itzhaki Living Trust Established November 1990*** |
| | ***Policy Period:*** | ***December 8, 2017 to December 8, 2018*** |
| | ***Claimants:*** | ***Holly Takas, Paul Nielsen, Elijah Nielsen, Zoey Takas*** |
| | ***Date of Loss:*** | ***April 18, 2018*** |

Dear Ms. Hazard:

This firm represents Ms. Agnes Itzhaki and Rontal Development LP with respect to this claim. We are writing in response to your August 5 correspondence to ask USLI to reconsider its refusal to defend its insured(s) in this matter. Based on our review of the complaint, the subject USLI policy and the other materials identified in your correspondence, it seems apparent that the complaint against your insured(s) alleges a potentially covered liability for damages because of "bodily injury" to which the policy applies, and that USLI thus has a duty under California law to defend its insured(s) against the claims asserted in the complaint.

Under Coverage A of the subject policy, USLI promised in section 1. a. to defend its insured(s) against any "suit" seeking damages because of "bodily injury" to which the policy applies. USLI agreed in section 1. b. (as amended in the Premises Limitation Endorsement) that the policy applies to "bodily injury" if it is caused by an "occurrence" that takes place on or within the perimeter of the scheduled premises, which are defined in the policy declarations as "Neuralia Rd & Mendburu Rd, Calif City, CA 93505."

In this case, it is alleged that the "bodily injury" was caused by an "occurrence" that took place on or within the scheduled premises. It thus is undisputed that the subject lawsuit constitutes a

"suit" against your insured(s) seeking damages because of "bodily injury" to which the policy applies and, as noted above, USLI promised to defend its insured(s) against any suit seeking such damages.

Under California law, an insurer must defend its insured against any "suit that *potentially* seeks damages within the coverage of the policy." *Gray v. Zurich Ins. Co.* (1966) 65 Cal.2d 263, 275; *North American Bldg. Maintenance, Inc. v. Fireman's Fund Ins. Co.* (2006) 137 Cal.App.4th 627, 640. This means that the insurer's duty to defend is excused only where the complaint "can by no conceivable theory raise a single issue which could bring it within the policy coverage." *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295; *North Counties Engineering, Inc. v. State Farm Gen. Ins. Co.* (2014) 224 Cal.App.4th 902, 919 ["If coverage depends on an unresolved dispute over a *factual* question, the very existence of that dispute would establish a possibility of coverage and thus a duty to defend."]. This also means that an insurer seeking to avoid its defense duty based on a policy exclusion must establish undisputed facts that conclusively show that all potential liability would be excluded under the language of the exclusion. *Atlantic Mutual Ins. Co. v. J. Lamb, Inc.* (2002) 100 Cal.App.4th 1017, 1038-1039; *Wausau Underwriters Ins. Co. v. Unigard Security Ins. Co.* (1998) 68 Cal.App.4th 1030, 1038.

In this case, there are no undisputed facts that conclusively show that all potential liability would be excluded under the language of either the Independent Contractors/Subcontractors Exclusion or the pollution exclusion. With respect to the former, there are no undisputed facts that conclusively establish that the alleged bodily injury arose from any operations performed for the insured(s) by Mr. Peralta; to the contrary, it appears that the alleged bodily injury arose from the other driver's negligent operation of his vehicle combined with unusually high winds that blew dirt and dust onto the highway. In particular, USLI has failed to adduce *any* undisputed facts sufficient to establish that the winds would not have blown dirt and dust onto the highway absent any operations by Mr. Peralta, nor has USLI adduced *any* facts in support of its conclusion that the "damages alleged in the Action arose from operations performed for the Insured by a contractor."

Similarly, USLI has failed to identify any undisputed facts that conclusively show that all potential liability would be excluded under the language of the pollution exclusion. Contrary to USLI's position, the language of the exclusion does not identify either dirt or dust as a "pollutant." In fact, neither "dirt" nor "dust" is even mentioned in the policy definition of "pollutant," nor has USLI adduced any undisputed facts that conclusively establish that either dirt or dust is toxic or hazardous, or that they "cause contamination to property and the environment" such as "smoke, vapor, soot, fumes, acids, alkalis, chemicals, toxic materials" or any of the other contaminants specifically identified in the definition of "pollutants." USLI likewise has failed to adduce any undisputed facts that conclusively establish that the dirt or dust alleged in the complaint constitute "silica," a "volatile organic compound," waste" or an "organic pathogen" as those terms are defined in the exclusion. More specifically, USLI has failed to adduce *any* undisputed facts sufficient to establish that the "bodily injury" alleged in the complaint arose out of the presence of or exposure to a "pollutant" as that term is defined in the

policy, or that no such bodily injury would have been suffered had it not been for the presence of or exposure to a "pollutant" as that term is defined in the policy.

Thank you for your attention to this matter. Please respond in writing within ten days of the date of this letter.

Very truly yours,

MARK A. GRAF
Senior Counsel

MAG

LAW OFFICES OF
SACRO & WALKER LLP
700 NORTH BRAND BOULEVARD, SUITE 610
GLENDALE, CALIFORNIA 91203
TEL: (818) 721-9597
FAX: (818) 721-9670
www.sacrowalker.com

JENNIFER YU SACRO
Direct Dial: (818) 629-0844
E-mail: jsacro@sacrowalker.com

November 6, 2019

**VIA EMAIL (graf@parkermillsllp.com)**
**FOLLOWED BY U.S. MAIL**

Mark A. Graf, Esq.
PARKER MILLS LLP
800 W. 6th Street, Suite 500
Los Angeles, California 90017

**Re:** ***Holly Takas et al. v. Rontal Development, LP et al.***
Kern County Superior Court, Case No. BCV-19-101351

| | |
|---|---|
| Insured: | Rontal Development LP dba: The Agnes Itzhaki Living Trust Established November 1990 (the "Insured") |
| Claimants: | Holly Takas, Paul Nielsen, Elijah Nielsen, Zoey Takas |
| USLI Policy No.: | CL 1786660A, eff. December 8, 2017 to December 8, 2018 (the "Policy") |
| USLI Claim No.: | K125159 |

Dear Mr. Graf:

Our firm represents United States Liability Insurance Company ("USLI") with respect to the above-referenced claim. We write in response to your letter to USLI's Cheryl Hazard, dated October 30, 2019. After consideration of the facts and information provided in your letter, please be advised that USLI reaffirms its position that the above-captioned lawsuit (the "Action") presents no potential for coverage under the Policy at this time.

In your letter, you state that the injuries at issue arose from "the other driver's negligent operation of his vehicle combined with unusually high winds that blew dirt and dust onto the highway." Based on the information available to USLI, the loss is alleged to have "arisen from" several factors. With respect to the liability that the claimants attribute to the *Insured*, the complaint states:

> 18. On or about March 15, 2018[,] defendants Peralta and the Itzhaki Defendants graded the Itzhaki Property, removed the ground cover vegetation and loosened the soil, leaving the land stripped of its natural desert vegetation with a raw, loose dirt surface. The grading was done without a permit and created a road

> hazard due to an excessive dust condition on Neuralia Road. The Itzhaki Defendants were cited for this illegal activity and fined $250. Neither the Itzhaki Defendants nor defendant Peralta took steps at any time to remedy this dangerous condition.
>
> ...
>
> 20. … The recent grading of the Itzhaki Property that had stripped the natural desert vegetation allowed for sustained wind gusts to loft dirt, sand and dust into the air. At the time of the collision, fine airborne dirt and dust particles created a visual hazard across Neuralia Road, significantly limiting visibility of that portion of Neuralia Road adjacent to the Itzhaki Property where the head-on collision occurred.
>
> (Complaint at ¶¶ 18 and 20.)

But for the grading, which claimants assert altered the land's otherwise natural desert vegetation and created a dangerous condition, it is alleged that there would have been no airborne dust, as "the visibility on Neuralia Road was clear, except at the Itzhaki Property where it had been reduced to 12 feet because of the airborne sand, dust and gravel…" (Complaint at ¶ 22.)

The Independent Contractors/Subcontractors Exclusion contained in the Policy does not require that the loss primarily or solely result from work performed by a contractor; rather, the endorsement merely requires that the bodily injury, property damage, or personal and advertising injury "arise out of" any contractor's operations performed for any insured. The phrase "arising out of" does not mean a "substantial factor" or "predominating cause." *Continental Heller Corp. v. Amtech Mech. Svcs.*, 53 Cal.App.4th 500, 505-06 (1997). To the contrary, California courts have interpreted the phrase "arising out of" very broadly, requiring only "a minimal causal connection or incidental relationship." *Acceptance Ins. Co. v. Syufy Enterprises*, 69 Cal.App.4th 321, 328 (1999). Here the allegations of the complaint plainly point to Mr. Peralta's grading as creating a "dangerous condition at Neuralia Road at the Itzhaki Property" (Complaint at ¶ 24); indeed, that is the basis for liability alleged against the Insured and Mr. Peralta.

"The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy." *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal.4th 1076, 1081 (1993). Here, the allegations tie the Insured's liability to the work performed by Mr. Peralta, which work claimants assert created a dangerous condition. Indeed, there is no other alleged basis for liability to attach to the Insured.

Moreover, as more fully set forth in Ms. Hazard's August 2, 2019 letter to the Insured, the extrinsic information available to USLI also indicates that the Insured was aware that the grubbed debris on the Itzhaki Property, unless allowed to be removed by the local government without requiring the Insured to comply with a newly-implemented permitting process, would remain

onsite and pose a hazard as it may continue to be blown around by the wind. (*See* April 12, 2018 Email from Bruce Watkins to Bob Stockwell of the California City government.) In May 2018, the Insured was cited by the Eastern Kern County Air Pollution Control District for fugitive dust. Accordingly, based on the complaint allegations and the extrinsic information available to USLI, the Action is not potentially covered under the Policy.

Further, coverage for the Action is barred by the Absolute Exclusion for Pollution contained in the Policy. The exclusion precludes coverage for bodily injury:

> [A]rising directly, indirectly, in concurrence with or in any sequence out of the actual, alleged or threatened presence of or exposure to, ingestion, inhalation, absorption, contact with discharge, dispersal, seepage, release or escape of "pollutants", "organic pathogens", "silica", asbestos, or lead, whether or not any of the foregoing are (1) sudden, accidental or gradual in nature; (2) intentional; or (3) expected or intended from the standpoint of the insured.

The complaint alleges a connection between the accident and the dirt, sand, and dust that were discharged, dispersed, and/or escaped from the property. Pursuant to the plain language of the exclusion, such a connection, whether direct or indirect, is sufficient to trigger the exclusion.

The fact that neither "dirt" nor "dust" is specifically identified in the definition of "pollutant," as argued in your letter, is irrelevant, as there can be no reasonable argument that dirt, sand, and dust are not within the broad scope of the term "pollutant," which is defined to mean:

> [A]ny solid, liquid, gaseous, bacterial, fungal, electromagnetic, thermal or other substance that can be toxic or hazardous, cause irritation to animals or persons and/or cause contamination to property and the environment including smoke, vapor, soot, fumes, acids, alkalis, chemicals, toxic materials, "volatile organic compound" and gases therefrom, radon, combustion byproducts and waste.

"Dust has been held to be a pollutant within the meaning of the pollution exclusion in California and elsewhere." *Cold Creek Compost, Inc. v. State Farm Fire and Cas. Co.*, 156 Cal.App.4th 1469, 1486 (2007) (citing *Garamendi v. Golden Eagle Ins. Co.*, 127 Cal.App.4th 480, 485–486 (2005) [silica dust]; *Riverwatch v. County of San Diego*, 76 Cal.App.4th 1428, 1454 (1991) [particulate dust from quarry project]; Cal. Health & Saf. Code, § 40731, subd. (a) ["fugitive dust emissions" from "travel on unpaved roads"]). Indeed, the fact that fugitive dust is monitored by local environmental agencies, such as the Eastern Kern County Air Pollution Control District, shows that the airborne discharge of dirt, sand, and dust qualifies as a "pollutant" under this definition.

If there is any other information that the Insured would like USLI to consider or if you have any questions or concerns, please do not hesitate to contact me.

By investigating this matter in furtherance of the Insured's request that USLI reconsider its coverage position, USLI continues to reserve all of its rights and defenses it may have under the

Policy and/or applicable law. This communication is not, and should not be construed as, a waiver of any terms, conditions, exclusion, or other provisions of the Policy, or any other insurance policies issued or allegedly issued by USLI or any of its affiliates. This communication is not, and should not be construed as an agreement by USLI to any expenditure of funds. USLI continues to reserve all rights to the fullest extent.

Very truly yours,

SACRO & WALKER LLP

JENNIFER YU SACRO

LAW OFFICES OF
SACRO & WALKER LLP
700 NORTH BRAND BOULEVARD, SUITE 610
GLENDALE, CALIFORNIA 91203
TEL: (818) 721-9597
FAX: (818) 721-9670
www.sacrowalker.com

JENNIFER YU SACRO
Direct Dial: (818) 629-0844
E-mail: jsacro@sacrowalker.com

January 8, 2020

**VIA EMAIL (graf@parkermillsllp.com)**
**FOLLOWED BY U.S. MAIL**

Mark A. Graf, Esq.
PARKER MILLS LLP
800 W. 6th Street, Suite 500
Los Angeles, California 90017

**Re:** ***Holly Takas et al. v. Rontal Development, LP et al.***
Kern County Superior Court, Case No. BCV-19-101351

| | |
|---|---|
| Insured: | Rontal Development LP dba: The Agnes Itzhaki Living Trust Established November 1990 (the "Insured") |
| Claimants: | Holly Takas, Paul Nielsen, Elijah Nielsen, Zoey Takas |
| USLI Policy No.: | CL 1786660A, eff. December 8, 2017 to December 8, 2018 (the "Policy") |
| USLI Claim No.: | K125159 |

Dear Mr. Graf:

As you know, our firm represents United States Liability Insurance Company ("USLI") with respect to the above-referenced claim. We write in response to your December 18, 2019 letter regarding USLI's coverage position with respect to the above-referenced lawsuit (the "Action"). For the reasons discussed herein, after consideration of the facts and information provided in your letter, USLI respectfully disagrees with the arguments raised in your letter and again reaffirms its position that the Action presents no potential for coverage under the Policy at this time.

## 1. The Independent Contractors Exclusion

"The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy." *Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal. 4th 1076, 1081 (citing *Gray v. Zurich Insurance Co.* (1966) 65 Cal. 2d 263, 276. This is precisely how USLI began its investigation – by analyzing coverage based on the factual allegations and theory of liability alleged in the complaint in the Action, which implicate the application of the Independent Contractors Exclusion.

USLI did not end its investigation there, however. In the course of its investigation, USLI learned, among other things, that while co-defendant Lou Peralta's work at the property may be more accurately described as "grubbing" (*i.e.*, removal of trees and shrubs, cleaning the property of trash, and watering the property down) rather than "grading," regardless of the distinction, the local government required that a permit be issued for the work that Mr. Peralta was performing at the property. USLI learned that, indeed, during the month prior to the accident, Mr. Peralta and Bruce Watkins, acting on behalf of the Insured, had been in contact with the local government regarding grubbing permits and processes, and were informed that the grubbing work being done at the property needed to halt until a permit was issued. This communication continued from March 15, 2018 through and including April 12, 2018, *i.e.* the date of the accident. On April 12, the Insured's representatives were communicating with local government officials regarding concerns about the wind blowing around grubbed debris that remained on the property that could not be cleared without the issuance of a permit.

The facts available to USLI further indicated that Mr. Peralta was the Insured's contractor. While there is no written contract between the Insured and Mr. Peralta, USLI has been advised by the Insured that Mr. Peralta has performed clearing services for the Insured at least twice, and clean-up services at least three times. Mr. Peralta has performed grubbing services for other properties owned by the Insured and/or Agnes Itzhaki, and Mr. Peralta has performed grubbing for other parties all around California City for years. USLI understands that because Mr. Peralta was not the owner of the property, the local government informed him in March 2018 that he could not obtain the relevant permitting papers and that he needed written permission from the owner to perform any clean-up, grubbing or grading, which written permission must be in Mr. Peralta's possession at all times. Over the past several years, the Insured has paid Mr. Peralta a total of $13,300.

On April 12, 2018, the subject accident took place on public roads adjacent to, but not on the property.

Finally, USLI learned that in February 2018, the Insured had been cited for violation of the Eastern Kern County Air Pollution Control District for fugitive dust.

Given both the allegations of the complaint and the information obtained by USLI through its investigation, it is plain that the Independent Contractors Exclusion applies to preclude coverage under the Policy for the Action. Regardless of how Mr. Peralta's specific activities are classified, they are within the scope of the exclusion because the exclusion simply requires that the liability arise out of operations performed by a contractor – which not only is what is alleged in the complaint, but pursuant to USLI's investigation, also appears to be precisely what occurred.

While USLI has an obligation to consider extrinsic *facts* that it learns that bear on the coverage analysis, none of the authorities asserted in your letter require USLI to devise alternative *theories of liability* in the absence of facts supporting same. Indeed, although an insurer's defense obligation may be triggered where facts stated or fairly inferable in a complaint suggest a potentially covered claim (*Hartford Cas. Ins. Co. v. Swift Distribution* (2014) 59 Cal. 4th 277; *Swain v. California Cas. Ins. Co.* (2002) 99 Cal.App.4th 1), an insured may not speculate about

unpled facts to manufacture coverage. *Gunderson v. Fire Insurance Exchange* (1995); *see also Gauntlett v. Ill. Union Ins. Co.*, 2011 WL 5191808 (N.D. Cal. 2011) (an insurer's duty to defend is determined by the claims actually asserted).

USLI's investigation has not uncovered – nor does your letter offer – any *facts* extrinsic to the complaint in the Action that indicate that the liability being asserted against the Insured in the Action is potentially covered. To the contrary, as set forth in my November 6, 2019 letter, the complaint alleges that the Insured's liability is specifically attributable to Mr. Peralta's operations. *See* Complaint at ¶¶ 18, 20, 22. USLI's investigation revealed consistent facts. Because the allegations against the Insured as presently framed by the complaint, as well as the facts learned by USLI in its coverage investigation, do not create a potential for coverage under the Policy, USLI has no obligation to defend the Insured in the Action.

**2. The Absolute Exclusion for Pollution**

In addition to the Independent Contractors Exclusion, the Absolute Exclusion for Pollution is a separate and complete bar to coverage for the claims asserted in the Action.

First, the fact that the Absolute Exclusion for Pollution endorsement supplies an expanded definition of "pollutants" but it does not delete the original definition of "pollutants" in the original policy form is of no consequence. The Absolute Exclusion for Pollution, which applies only to Coverage A, clearly sets forth its own definition of the term "pollutants" which is to be used for that exclusion. It does not replace or delete the term in the original policy form because the original definition remains applicable to the pollution exclusion for Coverage B.

More important, your reliance on *MacKinnon v. Truck Insurance Exchange* (2003) 31 Cal. 4th 635 is misplaced, as that case involved a narrower, much less specific exclusion. The pollution exclusion at issue in *MacKinnon* read as follows:

> We do not cover Bodily Injury or Property Damage (2) Resulting from the actual, alleged, or threatened discharge, dispersal, release or escape of pollutants: (a) at or from the insured location.
>
> The term "pollutants" was defined to mean:
>
> any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste materials. Waste materials include materials which are intended to be or have been recycled, reconditioned or reclaimed.

*MacKinnon* held that, given the above exclusion and definition of "pollutants," the exclusion was ambiguous because the insurer's proposed interpretation – that pesticide negligently dispersed in a confined area constituted a "pollutant" because it was an "irritant or contaminant" – was overbroad and would lead to absurd results. *Id.* at 650. Instead, the Supreme Court adopted

the insured's interpretation that the exclusion was to limited to events commonly thought of as pollution – specifically, environmental pollution. *Id.* at 653-54.

However, the Absolute Exclusion for Pollution applicable to the Policy's Coverage A is far broader than the exclusion addressed by *MacKinnon*, and the definition of "pollutants" is much more encompassing. The Absolute Exclusion for Pollution, which was drafted after and in response to the *MacKinnon* decision, excludes coverage for bodily injury or property damage "arising directly, indirectly, in concurrence with or in any sequence out of the actual, alleged or threatened presence or exposure to…" pollutants. The Absolute Exclusion for Pollution defines a pollutant as any substance "that can be toxic or hazardous, cause irritation to animals or persons and/or cause contamination to property and the environment…" With an expanded scope of the exclusionary language and a broader definition of "pollutants," the reasoning of *MacKinnon* to interpret the pollution exclusion narrowly does not apply.[1]

But even if the reasoning of the *MacKinnon* court applied, the Absolute Exclusion for Pollution would not be found ambiguous as applied to the present situation. Fugitive dust constitutes traditional environmental pollution within the ambit of *MacKinnon*. Along those lines, governmental agencies – including the Eastern Kern County Air Pollution Control District, which cited the Insured in 2018 for excessive fugitive dust – specifically monitor fugitive dust so as to limit its impact on air pollution.

Furthermore, the reasoning of courts analyzing pollution exclusions subsequent to the issuance of the *MacKinnon* – even where the courts were examining older, more limited exclusions – supports the application of the Policy's Absolute Exclusion here. For example, in *Garamendi v. Golden Eagle Ins. Co.* (2005) 127 Cal.App.4th 480, the Court of Appeal found that even under the *MacKinnon* standard, silica dispersed as a by-product of industrial sandblasting qualified as a "pollutant," which was defined in the policy at issue as "any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste." While the Court noted that, pursuant to the *MacKinnon* analysis, the fact that silica may be an irritant or contaminant under some circumstances – like almost anything else –was not dispositive, the Court found that unlike the situation in *MacKinnon*, the widespread dissemination of silica dust "most assuredly is what is 'commonly thought of as pollution' and 'environmental pollution'." *Id.* at 486. In reaching this conclusion, the Court rejected the insured's argument that "wholesale environmental degradation, such as occurred at, for example, Love Canal, or the Stringfellow Acid Pits" was required to constitute pollution within the meaning of the exclusion, finding that dispersal over a limited area was sufficient to qualify as a "pollutant." *Id.* The *Garamendi* court also noted that federal regulations identified silica dust as an air contaminant. *Id.*

Even without the presence of silica in the dust at issue, the current claim is analogous. As in *Garamendi*, the dispersal of the dust at issue to adjacent properties including the road where the accident occurred is sufficient to constitute "environmental pollution," and the fact that

[1] For the same reason, *EFK Investments, LLC v. Peerless Ins. Co.*, 2014 WL 4802920 (N.D. Cal. 2014) is inapposite, as its finding that dust resulting from sandblasting operations did not constitute a "pollutant" was in the context of a definition of "pollutants" almost identical to that at issue in *MacKinnon*.

governmental environmental agencies *specifically monitor fugitive dust* demonstrates the propriety of applying the exclusion here, in contrast to the situation in *MacKinnon*. This is true even assuming the Absolute Exclusion for Pollution in the USLI policy were as narrow as the policy language at issue in *Garamendi*.

*Ortega Rock Quarry v. Golden Eagle Ins. Corp.* (2006) 141 Cal.App.4th 969 compels a similar conclusion. In that case, the insured operated a rock quarry in Orange County. El Niño storms caused a nearby creek to overflow and wash out an access road, so to maintain access, the insured placed fill dirt from the quarry along the road. The EPA issued an administrative order requiring the insured to cease and desist discharge of fill dirt and to restore the waterway on the grounds that the fill constituted pollutants as defined in the Clean Water Act. The *Ortega* court found that the fact that the dirt and rocks placed in the waterway were naturally occurring materials did not preclude application of the pollution exclusion at issue. *Id.* at 981. To the contrary, because the insured's activities *altered* the materials, the dirt and rocks could constitute "pollutants." *Id.* The situation is similar here, as the Insured's activities (through the Insured's contractor) at the site are alleged to have directly led to the dispersal of dust which contributed to the accident.

Furthermore, the *Ortega* court specifically held that the fact that an exclusion did not incorporate statutory definitions did not make it ambiguous; rather, state and federal environmental laws may provide insight into the scope of the definition of "pollutants" without being specifically incorporated. *Id.* at 980-81. Similarly, the fact that the Absolute Exclusion for Pollution in the USLI policy does not specifically reference airborne dust does not mean that airborne dust is outside the scope of the exclusion.

Moreover, *Cold Creek Compost, Inc. v. State Farm Fire and Cas. Co.* (2007) 156 Cal.App.4th 1469 supports application of the Absolute Exclusion for Pollution to the suit here, even though an older form of the pollution exclusion was also applied in *Cold Creek*. There, the insured operated a facility that composted organic materials including animal waste, grape pomace, and yard trimmings. Residents living near the facility initiated a nuisance action complaining primarily of noxious odors and dust emanating from the facility. The Insured's carrier declined coverage for the lawsuit based on the application of an older version of the pollution exclusion.

The *Cold Creek* Court analyzed the exclusion in the context of the *MacKinnon* analysis, and specifically found that both odors and dust emanating from the site were unquestionably contaminants:

> Dust has been held to be a pollutant within the meaning of the pollution exclusion in California and elsewhere (*Garamendi*, *supra*, 127 Cal.App.4th at pp. 485–486, 25 Cal.Rptr.3d 642 [silica dust]; *SDCP v. Wausau Underwriters Ins. Co.* (S.D.2000) 616 N.W.2d 397, 406 [cement dust] ), and dust is recognized and regulated as a form of air pollution under California environmental law (*Riverwatch v. County of San Diego* (1999) 76 Cal.App.4th 1428, 1454, 91 Cal.Rptr.2d 322 [particulate dust from quarry project]; Health & Saf. Code, § 40731, subd. (a) ["fugitive dust emissions" from "travel on unpaved roads"]). Cold Creek's

> arguments about dust are confined to a brief paragraph asserting that dust is not commonly thought of as a pollutant, and attempting to distinguish Garamendi on the ground that silica dust had been classified by regulation as an air contaminant. Those arguments failed in the context of coverage for odors, and they do not have any greater merit with respect to dust when viewed by what was presented in this case.
>
> *Id*. at 1486.

The facts of the foregoing cases vary significantly from *MacKinnon*, which involved injuries arising from the normal, though negligent, residential application of pesticides. *MacKinnon*, *supra*, 31 Cal. 4th at 654. The release of airborne dust is far more analogous to the airborne dispersal of silica (*Garamendi*), the dispersal of dirt and rocks due to the insured's activities (*Ortega*), and the release of dust into the air (*Cold Creek*), than to the intentional indoor dispersal of a pesticide in the course of its ordinary use. The Insured's reliance on *MacKinnon* is misplaced – again, not even accounting for the fact that the Absolute Pollution Exclusion is far more broadly-worded than any of the exclusions considered by these courts.

For the foregoing reasons, USLI has no obligation under the Policy with respect to the Action. If the Insured has additional or different factual information that the Insured believes would impact USLI's coverage analysis, we invite you to provide us such information for USLI's consideration.

Please be advised that we are not authorized to accept service on behalf of USLI.

USLI continues to reserve all rights to the fullest extent.

Very truly yours,

SACRO & WALKER LLP

JENNIFER YU SACRO

LAW OFFICES OF NEIL R. ANAPOL
A PROFESSIONAL CORPORATION
2550 Hollywood Way, Suite 202
Burbank, California 91505
(818) 566-7355
FAX (818) 566-7875

October 1, 2020

Jennifer Yu Sacro
Law Offices of Sacro & Walker LLP
700 North Brand Boulevard, Suite 610
Glendale, CA 91203

VIA E-mail: jsacro@sacrowalker.com

| | | |
|---|---|---|
| Re: | Claim No.: | K125159 |
| | Policy No.: | CL 1786660A |
| | Insured: | Rontal Development LP dba: The Agnes Itzhaki Living Trust Established November 1990 |
| | Claimants: | Holly Takas, Paul Nielsen, Elijah Nielsen, Zoey Takas |
| | Date of Loss: | April 18, 2018 |

Dear Ms. Sacro:

The purpose of this letter to renew Agnes Itzhaki's demand that United States Liability Insurance Company defend Ms. Itzhaki concerning the *Takas v. Itzhaki* lawsuit. I have reviewed your correspondence with Ms. Itzhaki's prior counsel, and for the reasons set forth below, I disagree with your contention that there is not even potential coverage under the USLI policy. The pollution exclusion and contractor exclusions which USLI incorrectly use as bases to preclude coverage cannot be read as broadly excluding even the possibility of coverage in any case in which a little sand is alleged to have caused an accident. Moreover, after conducting the thorough investigation of the claim that USLI should have conducted, Ms. Itzhaki now has evidence that the dust present in the air at the time of the accident was not caused by grubbing activities on her land a month before the accident. Accordingly, even if USLI correctly interpreted the insurance policy as a matter of fact, the pollution and contractor exclusions still do not apply.

As you know, in the lawsuit entitled *Takas v. City of California City et al.*, plaintiffs Holly Takas, Paul Nielsen, Elijah Nielsen, and Zoey Takas ("plaintiffs") alleged that they sustained serious injuries and that Kody Nielsen was killed in an automobile accident in California City, California, on April 18, 2018. Plaintiffs allege that Agnes Itzhaki, Rontal Development LP, and Rontal Development, LLC, owners of the land adjacent to the accident site, caused the accident by "removing ground cover vegetation" approximately a month before the accident. The complaint alleges: "The recent grading of the Itzhaki Property that had stripped the natural desert vegetation allowed for sustained wind gusts to loft dirt, sand and dust into the air. At the time of the collision, fine airborne dirt and dust particles created a visual hazard across Neuralia Road, significantly limiting visibility of that portion of Neuralia Road adjacent to the Itzhaki Property where the head-on collision occurred." See complaint, para. 19. According to plaintiffs, the limited visibility on Neuralia road caused by the dirt and dust caused the head-on collision. See Complaint, para. 27.

On July 6, 2018, Ms. Itzhaki tendered her defense of the Takas case to USLI, and USLI assigned an adjuster. Other than asking Ms. Itzhaki's insurance broker a few questions concerning the circumstances of the loss, USLI did not undertake any investigation of the claim at that time.

On May 15, 2019, plaintiff filed suit against Agnes Itzhaki and several other defendants. Shortly after receiving service of process on July 10, 2019, Ms. Itzhaki emailed the summons and complaint to USLI and requested that USLI defend her. On July 24, 2019, USLI claims examiner Cheryl Hazard sent Ms. Itzhaki an email asking her questions regarding the grubbing work on the property a month prior to the accident. Ms. Itzhaki responded to Ms. Hazard's email the following day. Other than receiving the complaint and Ms. Itzhaki's email of July 25, 2019, USLI conducted no investigation of the loss prior to August 5, 2019, when it declined coverage.

On August 19, 2019, Ms. Itzhaki's insurance broker sent an email to Ms. Hazard pointing out that USLI had no proof that the dust which allegedly caused the accident came from Ms. Itzhaki's property. You responded by letter dated August 21, 2019: "With respect to facts regarding the windstorm, the Complaint filed in the Action includes allegations identifying Mr. Peralta's work performed at the Insured's property as the cause of the visibility conditions that gave rise to the accident. See Complaint at ¶¶ 18-28. For purposes of its coverage analysis, USLI must assume that these allegations are true, as there is no other alleged basis for liability to attach to the Insured."

On October 30, 2019, Mark Graf, Ms. Itzhaki's attorney, sent you a letter asking that USLI reconsider its coverage declination. Mr. Graf essentially argued that USLI had not conducted a sufficient investigation to determine on the basis of undisputed facts that the winds would not have blown dirt and dust onto the highway absent any operations by Mr. Peralta (the man who grubbed the property in March 2018). Mr. Graf also disputed USLI's position that dust and dirt that allegedly resulted from grubbing activities on the property constitute a pollutant for purposes of the pollution exclusion.

In your letter dated November 6, 2019, you take the position that you can rely solely on the complaint in determining the facts of the underlying loss. Thus, because plaintiffs allege that Ms. Itzhaki's grubbing activities caused the accident, that issue is conclusively determined for coverage purposes. You also assert that the accident arose out of work performed by Ms. Itzhaki's contractor; thus the contractor exclusion applies even if this work was not a substantial factor in causing the accident. Finally, you took the position that the dust that allegedly caused the accident is a pollutant for purposes of the USLI pollution exclusion.

On December 18, 2019, Ms. Itzhaki's counsel responded to your November 6, 2019, letter. Once again, Mr. Graf took issue with USLI's complete reliance on the complaint in the underlying case to establish the facts upon which it based its coverage determination. As Mr. Graf puts it, "USLI thus cannot avoid its duty to defend its Insureds by relying on the plaintiffs' claim that the April 12 auto collision was caused by the work performed by Mr. Peralta almost a month earlier. To the contrary, USLI was required to conduct a prompt and thorough investigation of the claim to determine: (1) whether the alleged dust and dirt that plaintiffs claim contributed to the accident actually came from the Insureds' property as opposed to other property and, if so, (2) whether such alleged dust and dirt became airborne as a result of work performed by Mr. Peralta, or (3) whether it became airborne solely due to the high winds on the date of the accident, or (4) whether any dust or dirt allegedly loosened by Mr. Peralta already had been blown clear of the Insureds' property by high winds during the approximately one month period that separated the accident from Mr. Peralta's work." As late as the date of Mr. Graf's letter, USLI still had not conducted any such investigation.

Mr. Graf also continued to dispute USLI's interpretation of the pollution exclusion. Citing *MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, Mr. Graf argued that under CGL policies such as the USLI policy, "[c]overage will therefore be found unless the pollution exclusion conspicuously, plainly and clearly apprises the insured that certain acts of ordinary negligence… will not be covered." *MacKinnon, supra*, 31 Cal.4th at 649. In this case, nothing in the Pollution Exclusion conspicuously, plainly, and clearly apprises the Insureds that certain acts of ordinary negligence, such as removing trees and shrubs, cleaning the property of trash, and watering it down, will not be covered. Mr. Graf also disputed USLI's assertion that dust and dirt constitute environmental pollution in the context of grubbing vacant land.

By letter of January 8, 2020, you responded to Mr. Graf's letter. Therein, you assert that USLI did conduct an investigation; it investigated the relationship between Ms. Itzhaki and Mr. Peralta, which caused USLI to conclude that Mr. Peralta was Ms. Itzhaki's contractor. In your letter you also state that "USLI learned that in February 2018, the Insured had been cited for violation of the Eastern Kern County Air Pollution Control District for fugitive dust."

You then assert that while USLI has an obligation to consider extrinsic facts, it is not required to devise alternative theories of liability. You argue, citing *Gunderson v. Fire Insurance Exchange* (1995) 37 Cal.App.4th 1106, 1114, that an insured may not

speculate about unpled facts to manufacture coverage.

In *Gunderson*, a property owner (Ferrando) sued adjacent property owners (the Gundersons) to quiet title to real property, for declaratory relief, and for injunctive relief relating to an easement that the Gundersons claimed over her property. (*Gunderson*, *supra*, 37 Cal.App.4th at p. 1110.) The Gundersons tendered defense of the action to their homeowners liability insurer (Fire Insurance Exchange), but the insurer declined the tender because Ferrando's complaint contained no reference to a claim for bodily injury or property damage. (Ibid.)

After the Ferrando action settled, the Gundersons sued their insurer for breach of the insurance contract, but the insurer successfully moved for summary judgment on the ground that it had no duty to defend the Ferrando action. (*Id*. at pp. 1111–1112.) On appeal, the Gundersons argued the insurer had a duty to defend "because Ferrando could have made a claim for 'physical injury to or destruction of tangible property' in connection with [a] fence across a portion of the easement which [the Gundersons] removed at the outset of the dispute" over the easement. (*Id*. at pp. 1113, 1115.) The court rejected this argument because, among other things, "as in Hurley … , Ferrando's complaint, on its face, alleged no facts showing a potential for coverage" and "[t]he extrinsic 'facts' regarding potential liability for property damage [came] from speculation about how Ferrando might have (but did not) amend her complaint at some future date.

Ms. Itzhaki was not speculating about unpled facts to manufacture coverage. She is not asserting that plaintiffs might amend their complaint in the future in a way that forms a basis for claiming that there is potential coverage. Rather, Ms. Itzhaki has been asking – since August 2019 – for USLI to investigate whether grubbing activities on her property in March 2018 caused the accident. Ms. Itzhaki never speculated about alternative theories of liability. Rather, she questioned the premise that something which USLI considers to be pollution caused the accident. USLI still has not conducted an investigation into that issue.

The balance of your letter disputes the applicability of *MacKinnon*. As I understand your argument, *MacKinnon* can be disregarded as precedent because USLI (or ISO) drafted around it. Thus, the new "absolute pollution exclusion" is sufficiently broad to encompass perfectly innocent, non-industrial activities by an insured that allegedly result in dust and dirt escaping into the environment.

An important insurance industry standard for the interpretation of insurance policies is that any interpretation must avoid absurd results. An absurd result would be to interpret an insurance policy so one provision in the policy would negate most or all of the coverage afforded under the policy. By interpreting the pollution exclusion broadly, USLI eliminates a huge swath of coverage. The policy defines a pollutant as any substance "that can be toxic or hazardous, cause irritation to animals or persons and/or cause contamination to property and the environment..."

An irritant is defined as "something that irritates or excites," or "to provoke impatience,

anger, or displeasure in." (*Webster's Collegiate Dictionary*, (11th ed., 2003), p. 663.) The noun version of irritant, a verb, is likewise defined as "subjected to irritation; esp.: roughened, reddened, or inflamed by an irritant." (*Id*.) Similarly, contaminant means "to soil, stain, corrupt, or infect by contact or association." (*Id*. at p. 269.) It is readily apparent that a literal interpretation of these terms would have profound adverse effects on coverage. For example, the mere release of water from one neighborhood yard onto another could be defined as an irritant, and thereby excluded. The inadvertent spraying of dish wash soap into the eye of another could be defined as a contaminant, and thereby excluded from coverage. Liability for any injuries arising from either of these incidents is clearly covered under the policy. The pollution exclusion was intended to exclude pollution that arises from industrial activity, not ordinary, non-industrial, non-commercial activities that happen to result in the disturbance of dust which allegedly causes bodily injury or property damage. Given USLI's interpretation of this policy, if a policyholder's gardener accidently leaves a little sand or dirt on a walkway and a third party slips on it, the pollution exclusion precludes coverage – clearly an absurd result.

In *Tsakopoulos v. American Manufacturers Mut. Ins. Co*. (E.D.Cal. Aug. 9, 2000, No. Civ. S990853 GEB JFM) 2003 WL 22595248, the district court held that plowing activities that discharged dredged or fill material into the waters of the United States were covered under a CGL policy despite the absolute pollution exclusion. The court noted that "this exclusion applies only to damages caused by 'pollutants,' a term which is defined in each policy as 'any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.' " The court held that the term "pollutants" was ambiguous in the context of the case, and therefore, under California law, the insurance contract should be construed strictly against the insurer and liberally in favor of the insured. (*Tsakopoulos, supra*, 2003 WL 22595248 at p. *5.)

The pollution exclusion has been held to be unambiguous in covering discharges of 'acids, alkalis and toxic chemicals,' but ambiguous as to discharges of 'natural materials.' See *Hicks v. American Resources Ins. Co*. (Ala. 1989) 544 So. 2d 952, 953 and *Molton, Allen & Williams v. St. Paul Fire & Marine Ins. Co.* (Ala.1977) 347 So. 2d 95, 99; *Sterling Builders, Inc. v. United Nat'l Ins. Co.* (2000) 79 Cal.App.4th 105, 112, 93 Cal.Rptr.2d 697. In the context of the instant case, the pollution exclusion is at the very least ambiguous when applied to grubbing activities that occurred a month earlier and allegedly resulted in dust during an extreme high wind event.

Because USLI repeatedly refused to abide by the duty of care that the law imposes on insurers to conduct a timely, fair, and reasonable investigation, Ms. Itzhaki was required to conduct her own investigation. Ms. Itzhaki hired Dr. Amato Evan, Director, Climate, Atmospheric Science, Physical Oceanography Division, Scripps Institution of Oceanography, University of California San Diego, to examine the factors that caused poor visibility at the time of the accident. A copy of Dr. Evan's report is attached. To summarize his findings, the reasons there were was low visibility at the time of the accident are: (1) exceptionally high wind conditions; and (2) a large number of wind-blown dust sources upwind of the accident site including unpaved roads, an unpaved airport, Rogers (dry) Lake, and a source at the base of the Tehachapi Mountains which is most

likely an alluvial fan. Ms. Itzhaki is not responsible for extreme high wind conditions or these sources of dust. Thus, even if your interpretation of the pollution and contractor exclusions is correct (which Ms. Itzhaki disputes) they do not apply to preclude coverage because Ms. Itzhaki's grubbing activities in March 2018 did not cause the accident. Moreover, Ms. Itzhaki's contractor also did not do anything that caused the accident.

Determination of the duty to defend depends, in the first instance, on a comparison between the allegations of the complaint and the terms of the policy. *Montrose Chemical Corp. v. Superior C*ourt (1993) 6 Cal.4th 287, 295, 24 Cal.Rptr.2d 467. "Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy." *Id*. at 295. Thus, a defense is owed when the insurer has knowledge of facts showing a potential for coverage, even if the complaint fails to allege such facts.

The reason for this rule is that the complaint can usually be amended to allege such facts. See *Gray v. Zurich Ins. Co*. (1966) 65 Cal. 2d 263, 277, 54 Cal.Rptr. 104, 113. "It is a settled rule that the insurer must look to the facts of the complaint and extrinsic evidence, if available, to determine whether there is a potential for coverage under the policy and a corresponding duty to defend." See *Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 880, 77 Cal.Rptr.2d 107, 123. Even if the face of the complaint does not indicate a potential for coverage under the policy, extrinsic facts known to the insurer may generate a duty to defend because (a) current pleading rules liberally allow amendment, and (b) the third party plaintiff who drafted the complaint cannot be the arbiter of the policy's coverage. *Gray v. Zurich Ins. Co., supra*, 65 Cal.2d at 275–277, 54 Cal.Rptr. at 112–113; *Montrose Chemical Corp. v. Superior Court, supra*, 6 Cal.4th at 295, 24 Cal.Rptr.2d at 471.

The California Supreme Court restated the essence of these rules this way: "If any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage." *Scottsdale Ins. Co. v. MV Transp*. (2005) 36 Cal. 4th 643, 654-655, 31 Cal.Rptr.3d 147.

Although USLI clearly prefers to rely solely on the facts alleged in the complaint to deny the existence of its duty to defend, extrinsic facts – that the dust present in the air at the time of the accident was caused by sources other than Ms. Itzhaki's grubbing activities – conclusively establish that the *Takas* complaint is potentially covered. As such, USLI owes Ms. Itzhaki a duty to defend.

Accordingly, Ms. Itzhaki demands that USLI immediately begin defending her (and her companies) in the *Takas v. City of California City* lawsuit. Please let me know 5:00 p.m. on October 5, 2020, whether or not USLI will agree to defend Ms. Itzhaki. If USLI has not so agreed by that date and time, Ms. Itzhaki will immediately file suit against USLI for breach of the implied covenant of good faith and fair dealing, breach of contract, and declaratory relief. Therein she will be seeking, in additional to her cost of defense, attorney's fees pursuant to *Brandt v. Superior C*ourt, prejudgment interest, and general

and punitive damages.

If you have any questions or comments, please do not hesitate to call me.

Very truly yours,

Neil R. Anapol

LAW OFFICES OF
SACRO & WALKER LLP
700 NORTH BRAND BOULEVARD, SUITE 610
GLENDALE, CALIFORNIA 91203
TEL: (818) 721-9597
FAX: (818) 721-9670
www.sacrowalker.com

JENNIFER YU SACRO
Direct Dial: (818) 629-0844
E-mail: jsacro@sacrowalker.com

October 9, 2020

**VIA EMAIL (neilanapol@gmail.com) ONLY**

Neil R. Anapol, Esq.
LAW OFFICES OF NEIL R. ANAPOL, APC
2550 Hollywood Way, Suite 202
Burbank, California 91505

| | | |
|---|---|---|
| **Re:** | ***Holly Takas et al. v. Rontal Development, LP et al.*** | |
| | Kern County Superior Court, Case No. BCV-19-101351 | |
| | Insured: | Rontal Development LP dba: The Agnes Itzhaki Living Trust Established November 1990 (the "Insured") |
| | Claimants: | Holly Takas, Paul Nielsen, Elijah Nielsen, Zoey Takas |
| | USLI Policy No.: | CL 1786660A, eff. December 8, 2017 to December 8, 2018 (the "Policy") |
| | USLI Claim No.: | K125159 |

Dear Mr. Anapol:

As you know, our firm represents United States Liability Insurance Company ("USLI") with respect to the above-referenced claim. We are in receipt of and write in response to your letter of October 2, 2020, regarding USLI's coverage position with respect to the above-referenced lawsuit (the "Action"). We have considered the arguments and additional information provided in your letter. However, USLI continues to respectfully disagree, and reaffirms its coverage position for the reasons set forth herein and in our prior correspondence.

Your letter asserts that USLI's investigation was not sufficiently thorough. USLI disagrees, and as outlined in our January 8, 2020 letter to Mark A. Graf, Esq., the investigation USLI conducted compelled the conclusion that the allegations of the Action are outside the scope of potential coverage under the Policy.[1] Page 4 of your letter requests that USLI investigate "whether grubbing activities on her property in March 2018 caused the accident," but that is not the issue that determines coverage. Rather, USLI's coverage determination must be based on the claim that is *actually asserted* against the Insured. *Horace Mann Ins. Co. v. Barbara B.* (1993) 4

[1] Among other things, the investigation conducted by USLI showed that in 2018, the Insured had been cited for violation of Eastern Kern County Air Pollution Control District ("EKAPCD") Rule 402, Fugitive Dust. Enclosed are copies of: (1) an EKAPCD Notice of Violations log reflecting a violation date of February 17, 2018 and a Notice of Violation date of May 11, 2018, redacted for entries unrelated to the Insured; and (2) the Notice of Violation issued to Ms. Itzhaki.

Cal. 4th 1076, 1081. Here the claim alleged in the Action against the Insured is specifically based on liability arising from grubbing operations. *See* Complaint at ¶¶ 18, 20, 22.

The complaint in the Action pleads no other facts suggesting or indicating a different, potentially covered basis for liability. *See Hartford Cas. Ins. Co. v. Swift Distribution* (2014) 59 Cal. 4th 277; *Swain v. California Cas. Ins. Co.* (2002) 99 Cal.App.4th 1. Similarly, USLI's investigation revealed no such facts, and neither your letter nor the correspondence from Mr. Graf identified any such facts. Mr. Evan's report concludes that the dust storm arose from a number of factors, including high wind conditions for which the Insured is not responsible, but the report does not provide facts to suggest any alternative basis for liability against the Insured at all, let alone one that might be potentially covered under the Policy. To the contrary, Mr. Evan's report simply refutes the basis alleged in the Action.[2] Under the circumstances, USLI reaffirms its coverage position that the Policy's contractors conclusion bars coverage for the Action.

In addition, the Policy's pollution exclusion precludes coverage *independently of whether the contractors exclusion applies*. Your statement on page 6 of your letter that the pollution exclusion "does not apply to preclude coverage because Ms. Itzhaki's grubbing activities in March 2018 did not cause the accident" is incorrect. The exclusion applies *regardless of the source of the airborne dust* and precludes coverage under the Policy for the Action on a completely separate basis than the contractors exclusion. The exclusion bars coverage arising directly or indirectly from *any* source of pollutants.

For the reasons set forth in our January 8, 2020 letter, the pollution exclusion contained in the Policy is not ambiguous as applied to the facts alleged in the Action. In *MacKinnon v. Truck Insurance Exchange* (2003) 31 Cal. 4th 635, the California Supreme Court held that a more narrow pollution exclusion than the one at issue here should be read to apply only to "conventional environmental pollution." *Id*. at 655. While the exclusion at issue here is far broader than the one considered by the Supreme Court in *MacKinnon*, even under the *MacKinnon* standard the Action is within the scope of such traditional environmental pollution. As explained in our January letter, the discharge of fugitive dust constitutes such traditional environmental pollution contemplated by the *MacKinnon* court.

The *Tsakopoulos v. American Manufacturers Mut. Ins. Co.*, 2003 WL 22595248 (E.D. Cal. 2000) case cited in your letter is unpersuasive. *Tsakopoulos* is a pre-*MacKinnon* unreported federal district court case with no precedential weight. Furthermore, the case of *Ortega Rock Quarry v. Golden Eagle Ins. Corp.* (2006) 141 Cal.App.4th 969 cited in our January letter extensively discussed *Tsakopoulos*, concluding that it was unpersuasive and inconsistent with *MacKinnon*.

> We do not find *Tsakopoulos* persuasive on the issue whether the definition of pollution in the total pollution exclusion was ambiguous. First, it was decided before *MacKinnon* and *Garamendi* [(2005) 127 Cal.App.4th 480] and therefore did

---

[2] Similarly, the assertion on page 6 of your letter that coverage is triggered because "the dust present in the air at the time of the accident was caused by sources other than Ms. Itzhaki's grubbing activities" presents no alternative basis for a potentially covered liability.

> not analyze the policies at issue in light of the principles set forth in those cases. Second, its conclusion that the definition of pollution was ambiguous is at odds with the conclusions of numerous other courts in the cases cited above that have considered the issue under facts analogous to those presently before us. We conclude that the pollution exclusion was not ambiguous, and the trial court properly ruled that it excluded coverage for Ortega's activities.
>
> *Id*. at 990.

The cases of *Hicks v. American Resources Ins. Co.* (Ala. 1989) 544 So. 2d 952 and *Molton, Allen & Williams v. St. Paul Fire & Marine Ins. Co.* (Ala. 1977) 347 So. 2d 95 cited in your letter are similarly unpersuasive, as they are out-of-state authorities cited by the *Tsakopoulos* court which also pre-date *MacKinnon*. The *Sterling Builders, Inc. v. United Nat'l Ins. Co.* (2000) 79 Cal.App.4th 105 case is merely cited by the *Tsakopoulos* court for the unremarkable proposition that contract terms must be examined in context.

For the foregoing reasons, USLI reaffirms its coverage position that it has no obligation under the Policy with respect to the Action. Once again, USLI invites the Insured to submit any factual information the Insured may have supporting a potentially covered theory of liability that the Insured believes would impact USLI's coverage analysis.

USLI continues to reserve all rights to the fullest extent.

Very truly yours,

SACRO & WALKER LLP

JENNIFER YU SACRO
RICHARD D. BREMER

Enclosures

# NOTICE OF VIOLATIONS
## Eastern Kern APCD

| Source Name | Rule/Reg # / Violation | Violation Date | NOV Date |
|---|---|---|---|
| [redacted] | | | |
| Property of Agnes Itzhaki | EKAPCD Rule 402 | 02/17/18 | 05/11/18 |
| [redacted] | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

# Eastern Kern Air Pollution Control District

2700 "M" Street, Suite 302
Bakersfield, CA 93301
Bakersfield: (661) 862-5250

NOV # D51118

## NOTICE OF VIOLATION

Date: 05 / 11 / 2018 Time: 04 : 24 AM PM (PM circled)

Issued To: agnes Itzhaki

Address: 12334 sunset Blvd, Los Angeles, Ca 90049

Location of Violation: APN 30227404, Neuralia + Lindbergh, California City, Ca

Permit Number: N/A

*YOU ARE HEREBY CHARGED WITH A VIOLATION OF:*

☑ Eastern Kern Air Pollution Rules and Regulations.

☐ California Health and Safety Code.

Rule/Section: Eastern Kern Air Pollution Control District Rule 402

Described as: Failure to submit a Fugitive Dust Emission Control Plan to the APCO prior to the start of any Large operation...

Issued By: Nicole Dickerson

Person to receive further information concerning this notice:

Name: agne Itzhaki

Telephone: (310) 980-5509 Fax: ( )

ND
INSPECTOR'S INITIALS

AIR POLLUTION 580 9149 **019** (REV. 03/11)

**White Copy** - EKAPCD **Yellow Copy** - Owner/Operator **Pink Copy** - Remittance

# *EASTERN KERN AIR POLLUTION CONTROL DISTRICT*

**INSPECTION/INVESTIGATION REPORT**

***Notice of Violation***

**PLACE OF INSPECTION/INVESTIGATION:** APN 30227404, Neuralia and Lindbergh, California City, Ca

**COMPANY\PERMIT NUMBER**: N/A

**INSPECTOR(S)/INVESTIGATOR(S)**: Nicole Dickerson, John Hayes, Brenton Smith

**DATE OF INSPECTION/INVESTIGATION**: 05/08/2018

**CONTACT(S):** Agnes Itzhaki **TITLE: Owner**

**DATE OF VIOLATION:** 05/08/2018

**NOV NUMBER:** 051118

**RESULTS OF INSPECTION/INVESTIGATION:**

On May 8th, 2018, employees of the Eastern Kern Air Pollution Control District were called out to a site in California City that had been graded and was an environmental hazard due to dust blowing from the property. On April 12th, 2018, a fatal car accident occurred when it is alleged that dust from this property caused unsafe driving conditions on Neuralia Rd. The property, approximately 15 acres, had been graded without a grading permit from the city and without a fugitive dust plan from Eastern Kern Air Pollution Control District. On observation, no dust mitigation had been done on the property. Eastern Kern Air Pollution Control District Rule 402 Section V. Part D states "An owner/operator shall submit a Fugitive Dust Emission Control Plan to the APCO prior to the start of any Large Operation as defined in Section III.CC. Activity shall not commence until APCO has approved or conditionally approved a Fugitive Dust Emission Control Plan." Large Operation is defined as "any construction activity on any site involving 10 or more contiguous acres of disturbed surface area, or any earthmoving activity exceeding a daily volume of 10,000 cubic yards, or relocating more than 2,500 cubic yards per day of bulk materials at least three days per year." On May 11th, I spoke with Agnes Itzhaki, who is the owner of the property and informed her of the climate in California City and why these rules are imposed. I also explained to her that a Fugitive Dust Plan needs to be filled out and turned in to the District. She was apologetic and stated that she never wanted this to happen and that she was willing to comply. An email was sent to Agnes Itzhaki with an application for a Fugitive Dust Plan and instructions.

**Violation(s):**

Eastern Kern Air Pollution Control District Rule 402 requires an owner/operator to submit a Fugitive Dust Emission Control Plan to the APCO prior to the start of any Large Operation and that activity shall not commence until APCO has approved or conditionally approved a Fugitive Dust Emission Control Plan.



**Figure 1 Looking West on Neuralia Rd towards Agnes Itzhaki's property.**

LAW OFFICES OF NEIL R. ANAPOL
A PROFESSIONAL CORPORATION
2550 Hollywood Way, Suite 202
Burbank, California 91505
(818) 566-7355
FAX (818) 566-7875

October 16, 2020

Jennifer Yu Sacro
Law Offices of Sacro & Walker LLP
700 North Brand Boulevard, Suite 610
Glendale, CA 91203

VIA E-mail: jsacro@sacrowalker.com

Re: Claim No.: K125159
Policy No.: CL 1786660A
Insured: Rontal Development LP dba: The Agnes Itzhaki Living Trust Established November 1990
Claimants: Holly Takas, Paul Nielsen, Elijah Nielsen, Zoey Takas
Date of Loss: April 12, 2018

Dear Ms. Sacro:

I am writing in response to your letter of October 9, 2020. You state: "the claim alleged in the Action against the Insured is specifically based on liability arising from grubbing operations," and "the complaint in the Action pleads no other facts suggesting or indicating a different, potentially covered basis for liability." Thus, you conclude that there is no reason for USLI to investigate the actual cause of the loss, and there is no factual basis for finding potential coverage.

However, the complaint at paragraph 18 alleges: "Neither the Itzhaki Defendants nor defendant Peralta took steps at any time to remedy this dangerous condition." The "dangerous condition" referred to in paragraph 18 is the loosened soil that was allegedly lofted into the air by high winds on the day of the accident. At paragraph 45, plaintiffs allege: "No defendant has taken any steps to abate the nuisance created and affecting Neuralia Road."

Thus, the complaint alleges an *omission* on the part of Ms. Itzhaki which is not an act of "pollution" and not something that Mr. Peralta did or failed to do. Given that the dust and dirt that allegedly limited visibility on the day of accident came from a variety of local sources, Ms. Itzhaki's alleged omission was not a mere failure to correct a problem that she caused. Watering the property, chemically binding the topsoil, or erecting wind breaks would have undoubtedly prevented dust and dirt from other sources from being lofted into the air on the day of the accident. Thus, the pollution and contractor exclusions do not apply to eliminate even the *possibility* of coverage under the USLI policy.

Accordingly, Ms. Itzhaki demands that USLI immediately begin defending her (and her companies) in the *Takas v. City of California City* lawsuit. Please let me know 5:00 p.m. on October 23, 2020, whether or not USLI will agree to defend Ms. Itzhaki. If USLI has not so agreed by that date and time, Ms. Itzhaki will immediately file suit against USLI for breach of the implied covenant of good faith and fair dealing, breach of contract, elder abuse, and declaratory relief. Therein she will be seeking, in addition to her cost of defense, attorney's fees pursuant to *Brandt v. Superior Court*, prejudgment interest, and general and punitive damages.

If you have any questions or comments, please do not hesitate to call me.

Very truly yours,

Neil R. Anapol

Enc.